Conway, Ch. J.
On July 4, 1956, shortly before 3:00 p.m., Peter Weinberger, then about one month old, was kidnapped from his carriage, which was on the rear patio of his home in Westbury, Nassau County. The baby’s mother, who discovered the kidnapping, found a handwritten ransom note on the floor of the patio, near the empty carriage, reading:
‘ ‘ Attention.
I’m sorry this had to happen, but I am in bad need of money, & couldn’t get it in any other way.
Don’t tell anyone or go to the Police about this, because I am watching you closely. I am scared stiff, & will kill the baby, at your first wrong move.
00
Just put $2000 xxx (Two thousand, in small bills in a brown envelope, & place it next to the sign Post at the corner of Albemarle Ed. & Park Ave. at Exactly 10 o’clock tomorrow (Thursday) morning. If everything goes smooth, I will bring the baby back & leave him on the same corner “ Safe & Happy ” at exactly 12 noon.
No excuses, I can’t wait!
Your baby sitter.”
On the following day, at the appointed time, the infant’s parents deposited a package of ransom money at each of the two intersections of Albemarle Eoad and Park Avenue. When no one arrived to collect the ransom, the packages were retrieved by the police. On the morning of July 10th, the kidnapper telephoned to the Weinberger home and, in accordance
*456 with his instructions, ransom money was placed in a mail box at a designated location. The kidnapper made no attempt to take that money and it, too, was retrieved. The kidnapper made a second telephone call on the afternoon of the same day, instructing the parents to bring the ransom money to one of the exits of the Northern State Parkway in Nassau County. These directions were also followed and the ransom was deposited in a blue bag found at the designated place. A second handwritten note which was inside of the bag read:
“ If everything goes smooth the baby will be left wraped in a Army blanket & placed at the exit of the Parkway closest to your house in exactly 1 hour.
Your baby sitter.”
Nevertheless, the ransom money was once again ignored, and when, after a time, it was not taken by the kidnapper, it too, was recovered.
A week elapsed and the identity of the kidnapper and the whereabouts of the Weinberger baby were still unknown. Thereupon, the Federal Bureau of Investigation entered the case officially. The ransom notes were submitted by Federal agents to handwriting experts, who, after examining a multitude of handwritings in widespread official places, on August 22d came upon the handwriting of defendant which matched the handwriting found in the ransom notes. Defendant’s arrest followed in the early hours of August 23d.
At first, defendant denied complicity in, or knowledge of, the crime. Then, confronted with the fact that his handwriting and the handwriting of the ransom notes were identical, he sought to cast the blame for the kidnapping upon another, stating that in jest he had written several notes similar to the ransom notes for friends, that he had thrown them in a wastebasket and that someone must have taken them for use in the kidnapping. He altered his story several times thereafter and finally signed a typewritten statement in which he admitted the kidnapping and stated that “ the baby was left on July 5, 1956, still alive, in the bushes by exit 37 on Northern State Parkway about 11:40 AM, July 5,1956.”
Between about 6:30 and 6:55 p.m., after La Marca had signed that statement, he was taken to Exit 37 on Northern State Parkway, and, pointing to a path near the service road, he announced that “it was to the right where the baby had been *457 left.” The area was searched until about 8:30 p.m. when darkness supervened. Thereafter, the F. B. I., having determined that it was without jurisdiction of crime because no State boundaries had been crossed by the kidnapper, surrendered defendant to the Nassau County police authorities. Defendant was then booked and a further written narrative statement was taken from him. In that statement defendant asserted that he and an accomplice had kidnapped the child; that it was he who wrote the ransom notes; that his friend kept the baby overnight and fed and changed it; that he waited at Exit 31 of the parkway while his friend went with the baby to procure the ransom money; that his friend returned with the baby at 10:15 a.m. and declared that he had not picked up the money because there were too many people in the area; that after talking for about 15 minutes, they drove to a diner to discuss the matter, leaving the baby in the front seat of his friend’s car; that they decided not to go any further with their plan; that they did not know whether to take the baby to a church or someplace else and leave it; that they then decided to “ drop it someplace in a wooded area ”; that they drove to Exit 37 of the parkway, the exit near defendant’s home; that they pulled up on the grass at that exit; that his friend “ then took the baby, which was still alive, from the front seat of his car and walked into the brush by the exit, with the baby in his arms”; that a few minutes later his friend came out of the brush without the baby; that they then separated (according to the typewritten confession given to the F. B. I. it was then about 11:40 a.m.) ; that, thereafter, he had made telephone calls to the parents of the child and that he had left a bag, fashioned from part of a discarded automobile seat cover, with the second ransom note in it, at Exit 28 of the parkway.
After his arraignment, La Marca identified one Joe Parisi as his accomplice. When Parisi was apprehended, La Marca recanted, claiming that he had merely wished to get Parisi into difficulty. He then told detectives that his accomplice was one “ Shorty ”, but although they located one “ Streety ”, who established his innocence, they were unable to locate “ Shorty.” That was the last information police obtained from defendant concerning any accomplice.
On the morning of August 24, 1956, the police began a systematic search of the area to which defendant had brought *458 them the night before. There, in a wooded section, the remains of the dead body of an infant were found, together with the remnants of materials bearing pins, labels and markings identified by Mrs. Weinberger as those on the clothes worn by her child at the time of the kidnapping. The child whose body was found had died as a result of asphyxia, starvation and exposure. Although the sex of the child was beyond determination, the age was about six weeks. The time of death could not be definitely determined. However, the medical examiner of Nassau County testified that a child could have lived for a week, exposed and without food, in July, before it would expire. This, however, was an “ outside opinion ”, a “ rank guess’, prompted by experience.
The indictment filed against defendant contained two counts. The first count charged him with having kidnapped the infant and the second count charged him with having killed the infant while engaged in the commission of the kidnapping. The defendant pleaded not guilty by reason of insanity. The jury returned a verdict of guilty on both counts and did not recommend that defendant be imprisoned for the term of his natural life. Defendant was thereupon sentenced to death for each of said crimes.
On this appeal no challenge is addressed to the sufficiency of the People’s evidence to establish (1) the kidnapping by defendant, (2) the legal sanity of defendant or (3) the death of the victim of the kidnapping. However, defendant contends that he is entitled to a new trial upon the grounds that the Trial Judge committed reversible error (a) in refusing to charge the jury that, if they found defendant legally insane on July 4th, they would have to find him not guilty on the first count; (b) in neglecting to answer a question propounded by the jury with respect to “ part time ” insanity; (c) in permitting the cross-examination of the defense psychiatrist on his trial testimony in the unrelated case of one Edward Barber, six months before; and (d) in refusing to charge the lesser degrees of homicide. It is also claimed that for several reasons the felony murder count should have been dismissed by the Trial Judge.
It is well settled that except where time is a material ingredient of the crime the prosecution is not confined in its evidence to the precise date laid in the indictment, but may prove that *459 the offense was committed at any time prior to the commencement of the prosecution and such proof does not constitute a material variance (Code Crim. Pro., § 280; People v. Jackson, 111 N. Y. 362, 369; People v. Krank, 110 N. Y. 488, 492; 42 C. J. S., Indictments and Informations, § 257, p. 1277; 27 Am. Jur., Indictments and Informations, §§ 70-72, pp. 633-635). Since time is not an element of the crime (Penal Law, § 1250), the People were not limited, as defendant maintains, to proving that the kidnapping charged in the first count took place on July 4th. Furthermore, we are persuaded that the indictment put the defendant upon notice that he was being charged in both counts with a continuing crime — a kidnapping which began on or about July 4, 1956 and continued until on or about August 24,1956. Thus, the first count of the indictment, which bears the date August 29, 1956, charges that defendant “ on or about the 4th day of July, 1956, wilfully and feloniously did take, carry away and detain one Peter Weinberger * * * with intent to keep and conceal said Peter Weinberger from his parents and to extort and obtain money and reward for the return and disposition of said Peter Weinberger * * *.” It goes on to assert “ said Peter Weinberger has not been released and returned alive.” (Emphasis supplied.) The second count charges that defendant “ between, on or about the 4th day of July, 1956, and on or about the 24th day of August, 1956, wilfully and feloniously, whilst then and there engaged in the commission of a felony, to wit, the crime and felony of Kidnaping, upon and affecting the person of one Peter Weinberger, did kill said Peter Weinberger. ’ ’ The indictment contains a final paragraph which reads: ‘ ‘ All of the acts and transactions alleged in each of the several counts of this indictment are connected together.”
In the main charge the Trial Judge instructed the jury that they must find the defendant' not guilty by reason of insanity if they found that he was insane during the commission of the crime; that kidnapping may be a continuing crime, and that in the present case they might find that the kidnapping began on or about July 4th, when the child was alleged to have been taken, and continued until such time as the child was returned alive or dead. In addition, in response to the question, “ What period of time is embraced in the phrase, ‘ During the time the act of kidnaping was committed ’f ”, asked by the jurymen, *460 the Trial Judge replied that “the felony of kidnaping may be a continuing crime, and that in this case you may find that the crime began on or about the 4th day of July, 1956, when the child is alleged to have been taken, and continued until such time as the child was returned alive or the child died.” No fault may be found with those instructions. There was no valid reason why the Trial Judge should have instructed the jury that the kidnapping charged in the first count was to be considered at an end on July 4th, with the taking of the baby, but that the kidnapping charged in the second count — the same kidnapping — might continue until the child died or was returned alive. Kidnapping, which involves the detention of another, is, by its nature, a continuing crime.
On direct examination defendant’s own psychiatrist testified that at all times defendant “knew the nature and quality of the act, he knew he was taking the infant and the purpose of taking the infant * * * ”, but that he did not know the act was wrong. On cross-examination, however, the doctor admitted that on the evening of July 4th defendant said his conscience began to bother him and that oh July 5th when he went back for the ransom he knew he had committed an act that was wrong. That being so, even if the jury accepted the testimony most favorable to defendant — that of his own psychiatrist — it could properly have found that on July 5th, with knowledge of the nature and quality of his acts of taking and detaining the child and of the reason for taking the child, and with knowledge that the act of detaining the child for the purpose of extorting ransom was wrong, defendant did. not return the child to its parents or to the public authorities, or place it where it was certain to be found alive but, rather, continued in the unlawful purpose of attempting to extort money from the parents for the safe return to their child and continued the ‘ ‘ detention ” or kidnapping by depositing the child in a secluded wooded area where there was little, if any, chance that anyone would discover him and where death was "virtually certain to overtake him. The word “ detain ” has several meanings, one being “ withhold.” In a very real sense the defendant here could be said to have withheld Peter Weinberger from the custody of his parents when he “ dropped ” the child where he did.
After the jurymen had deliberated for some time, they returned to the courtroom for additional instructions. The *461 third question asked by the jurymen, and with which we are here concerned, read: “If one should belive [sic] that the defendent [sic] was insane part of the time, during the commission of the crime must we find in favor of the defendent [sic].” Undoubtedly, as defendant recognizes, this question was prompted by the testimony of the defense psychiatrist that defendant did not know the difference between right and wrong at the time he took the infant but that later on the 4th of July or at least by the 5th of July he did know the difference. The Trial Judge did not answer the question. Instead, he told the jury:
“ Now I think you ought to go back and deliberate a little further before I answer the next piece of paper or the next question, because it may possibly be from what I have told you so far that you may be able to deliberate and come to a possible conclusion without the third question being answered. If you cannot, then ask it again.”
Defendant argues that this question should have been answered in the affirmative and that the failure to so answer it constituted reversible error. Clearly the question could only have been answered in the negative and the failure to answer it did not constitute reversible error.
In People v. Cooke (292 N. Y. 185, 188) this court (Desmond, J.) said: “It is not the law * * * that any failure by a court categorically to answer any question propounded by a jury must needs be reversible error. In each case we must decide whether there was serious prejudice to the defendant’s rights. ’ ’ Therefore, to reverse here we must find that the failure by the Trial Judge to answer the third question was prejudicial to defendant and we cannot so find.
The question, as framed, suggests that the one propounding it had concluded that defendant was sane part of the time during the commission of the crimes. Be that as it may, the Trial Judge might well have answered the question in the negative. That is, the defendant must be held legally accountable for the kidnapping and ensuing death, even if the jury believed that he may have been insane in the early stage of the . kidnapping, if prior to the termination of the crime he was restored to sanity and was thereby possessed of the mental capacity to formulate the requisite criminal intent and, while so possessed, persisted in the kidnapping. Since that is so, the Trial Judge, *462 in response to the third question, might properly have given a negative answer or could have elaborated and have advised the jury, in substance, that they were not entitled to find the defendant not guilty by reason of insanity unless they were agreed that he was legally insane, and thereby incapable of formulating the requisite criminal intent, during the entire period from the inception of the kidnapping until the termination thereof—either by the death or the return of the baby. The Trial Judge did not do so but did not commit reversible error by such failure. If we assume that the jury inferred an affirmative answer from the Trial Judge’s failure to reply to the third question—we recognize, of course, that this is not a likely possibility—we can only conclude that the defendant was benefited by the Judge’s failure to answer the third question. If, on the other hand, we assume that the jury inferred a negative answer from the Trial Judge’s failure to reply to the third question, we can only conclude that the defendant was not harmed by the Judge’s failure to answer the third question, for a negative answer was the correct answer to the question.
The cases of People v. Gonzalez (293 N. Y. 259) and People v. Gezzo (307 N. Y. 385), relied on by defendant in support of his proposition that the Trial Judge committed reversible error in neglecting to answer the third question, are factually distinguishable from the present case. The failure to answer the questions propounded in those cases was seriously prejudicial to the defendants’ rights. Not having received an answer to the questions asked, the juries in those cases may well have felt bound to presume premeditation from the fact that defendants had gone to the scenes of the homicides each armed with a revolver. If they did so conclude, the defendants were seriously prejudiced for no such presumption is known to the law. It is clear that no harmful inference could have been drawn here.
Defendant contends, further, that it was reversible error for the Trial Judge to permit the cross-examination of the defense psychiatrist on his testimony in the unrelated trial of one Edward Barber, six months before. It appears from the record that Barber, who allegedly had struck a woman on the head with a hammer, had been indicted for the crime sometime around 1950. At the time of indictment he was found to be unable to confer with counsel, to understand the proceeding or to make a defense and, so, was committed to Matteawan State Hospital. *463 The defense psychiatrist did not see him at that time. Six years later in May, 1956, Barber was released from Matteawan as able to stand trial. The defense psychiatrist, for the first time, examined him just before the trial, and testified, on or about May 15, 1956, that at the time of the commission of the crime, and at the time of the trial, Barber was suffering from a mental condition classified as schizophrenia of a paranoid type. The jury acquitted Barber on the ground of insanity. Barber was then returned to a State hospital to determine whether he was then sane or a menace to the community. Barber sued out a writ of habeas corpus for his release and, on or about June 19, 1956, the defense psychiatrist testified in the habeas corpus proceeding that Barber was not then, insane and was not then a menace to the community and Barber was discharged from the State hospital.
The defendant’s complaint is that the District Attorney, in Ms cross-examination of the defense psychiatrist, accused the doctor of testifying “ exactly opposite in two different courts ”; that in fact the issues in the two trials were different — in the criminal trial the question was whether defendant was sane at the time he committed the crime and in the habeas corpus proceeding the question was whether defendant was then sane or whether he was then a menace to the commuMty; that the District Attorney did not make that clear to the jury but, rather, confused the issues and that in view of La Marca’s defense of insanity, tMs confusion of issues, which reflected on the credibility of the defense psychiatrist’s testimony, had a prejudicial impact on the jury.
While it may be true that in cross-examining the defense psychiatrist the District Attorney did not distinguish between the issue to be resolved in the criminal trial and the issue to be resolved in the habeas corpus proceeding, the defendant was not prejudiced thereby for on redirect examination defense counsel explained the difference in the two proceedings through the defense psychiatrist and in his summation repeated the explanation. Additionally, we must point up the fact that on the criminal trial, after Barber’s release from Matteawan, the defense psychiatrist testified that when he examined Barber two days prior to the trial he found him to be suffering from a mental condition classified as schizophrenia of a paranoid type and that at the time of the trial itself, two days later, he was *464 a schisophrenic. Nevertheless, one month later, without having further examined the defendant, the defense psychiatrist testified in the habeas corpus proceeding that defendant was then “ not psychotic, not suffering from any mental disorder.” We believe there is a clear inconsistency in the testimony of the defense psychiatrist that Barber was suffering from a mental condition on May 15, 1956, but that he was not suffering from any mental disorder on June 19, 1956. Undoubtedly in cross-examining the doctor as he did, the District Attorney intended to impeach his credibility as a witness by demonstrating that inconsistency to the jury, and we think he was entitled to do so.
This court has not ruled that every defendant charged with felony murder is entitled to a charge on the lesser degrees of homicide. A defendant may not insist upon such a charge being given unless the evidence spells out some form of common-law homicide. Defendant’s claim that a jury could properly have found him guilty of a lesser degree of homicide, viz., manslaughter, is based upon the premise that the jury should have been permitted to find that by depositing the child in the shrubbery he abandoned the kidnapping or that the kidnapping was then complete and, upon such a finding, that the act of abandoning the child was a misdemeanor under section 483 of the Penal Law proscribing the endangering of a child’s health. We are unable to adopt such a line of reasoning. The defendant could not terminate or abandon the kidnapping, thereby reduce the gravity of his offense, and assure himself of an escape from the death penalty by simply leaving the helpless infant of one month of age in a place where there was little, if any, likelihood that he would be found alive. In effect, defendant consigned the child to death. By providing that the death penalty shall not apply nor be imposed upon the kidnapper if the victim of the kidnapping be returned alive prior to the opening of the trial (Penal Law, § 1250), the Legislature intended to encourage kidnappers to return their victims alive. If the defendant were to be sustained in his assertion that a jury should be permitted to find the kidnapping ended with the abandonment of the infant under the shocking circumstances described in the present record, the result would be a holding that a kidnapper may likewise escape the death penalty by merely abandoning the victim, even though that act of abandonment does not constitute compliance with the statu *465 tory mandate that he return the victim alive and even though the death of the victim is the natural and probable consequence of the kidnapper’s acts and the direct result of a chain of incidents put into motion by the kidnapper. To state the argument is to answer it. (See People v. Keshner, 304 N. Y. 968; People v. Kane, 213 N. Y. 261.) There is no justification in this record for defendant’s premise that he could have been found guilty of manslaughter only and, so, the Trial Judge properly refused to charge the lesser degrees of homicide. In any event, the defendant was also convicted of kidnapping, a capital crime under section 1250 of the Penal Law.
Finally, defendant urges that the murder count should have been dismissed because (1) kidnapping is not a felony properly included within the scope of subdivision 2 of section 1044 of the Penal Law, defining as felony murder, a “ killing * * * by a person engaged in the commission of, or in an attempt to commit a felony, either upon or affecting the person killed or otherwise ”; (2) the acts constituting kidnapping merged in the homicide, and (3) the acts causing death were not committed while the kidnapping was in progress but after the kidnapping had been terminated or abandoned by the defendant’s having left the child in the woods. What was said in the last preceding paragraph renders unnecessary any discussion of this latter claim and we shall limit our discussion to points (1) and (2).
Unlike certain other jurisdictions which reserve their severest punishments for killings perpetrated in the commission of certain specified felonies, our State, through the Legislature, has decreed that a homicide constitutes felony murder, punishable by death, if it be perpetrated “by a person engaged in the commission of, or in an attempt to commit a felony * * * ” — any felony (emphasis added). (Penal Law, § 1044, subd. 2; and see Note, The Felony Murder Doctrine and Its Application Under the New York Statutes, 20 Corn. L. Q. 288, 294.) One necessary qualification has been engrafted onto our felony murder rule and that is that the underlying felony must be independent of the homicide for, otherwise, every homicide, not justifiable or excusable, would occur in the commission of a felony — namely, the assault which ended in death—with the result that premeditation, deliberation and intent to kill would never have to be established to convict an accused of murder *466 in the first degree (People v. Hüter, 184 N. Y. 237; People v. Wagner, 245 N. Y. 143; People v. Moran, 246 N. Y. 100, 102). “ The felony that eliminates the quality of the intent must be one that is independent of the homicide and of the assault merged therein, as e.g., robbery or larceny or burglary or rape.” (People v. Moran, supra, p. 102.) Thus, in Buel v. People (78 N. Y. 492, 497, affg. 18 Hun 487), we held that a felony murder conviction may be based upon an attempt at rape, even though death was caused by the acts of violence which constituted the felonious attempt for, ‘ ‘ While force and violence constitute an important element of the crime of rape, they do not constitute the entire body of that offense.”
It is defendant’s position that the seizure, detention and depositing of the infant in the wooded area were but a felonious assault, aggravated to be sure, but basically an assault and that, therefore, the kidnapping merged in the homicide. We cannot agree. While force and violence may constitute an important element of the crime of kidnapping a child under the age of sixteen years (Penal Law, § 1250, subd. 2), as they constitute an important element of the crimes of rape and robbery, they do not constitute the entire body of that offense. A taking or detaining of the infant with intent to keep or conceal it from the person having the lawful care or control of it, or to extort or obtain money or reward for the return or disposition of the child is the essence of that crime. That being true, the doctrine of merger is not available to this defendant.
The guilt of the defendant having been established beyond a reasonable doubt, and no error justifying reversal having-been committed in the course of the defendant’s trial, his conviction must be affirmed.
The judgment of conviction should be affirmed.