UNITED STATES of America,
Plaintiff–Appellee,

v.

Marge GARCIA, Defendant–Appellant.

UNITED STATES of America,
Plaintiff–Appellee,

v.

Andro GARCIA, Defendant–Appellant.

Nos. 86–5299, 86–5300.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Jan. 4, 1988.

Decided Aug. 16, 1988.

Steve Cochran, Wyman, Bautzer, Kuchel & Silbert, Los Angeles, Cal., for defendant-appellant Marge Garcia.

Marcia J. Brewer, Los Angeles, Cal., for defendant-appellant Andro Garcia.

Nancy Wieben Stock, Asst. U.S. Atty., Los Angeles, Cal., for plaintiff-appellee.

Before CANBY and WIGGINS, Circuit Judges, and LOVELL,* District Judge.

CANBY, Circuit Judge:

## INTRODUCTION

On May 15, 1986, Andro Garcia and Marge Garcia were indicted for kidnapping and aiding and abetting kidnapping. 18 U.S.C. §§ 1201(a); 2(a). The indictment charged that the kidnapping began on "a date unknown" and continued "to on or about May 20, 1981." The Garcias challenged the indictment as time-barred by the federal five year statute of limitations. 18 U.S.C. § 3282. The district court rejected the challenge. Trial by jury was waived and the defendants were convicted of the offense.

On appeal, the Garcias renew their contention that their prosecution is barred by limitations. That question presents two subsidiary issues, one a novel question of law and the other a related question of fact. They are: (1) whether the federal offense of kidnapping is completed at the time of abduction and transport across a state or national line, or whether it is a continuing offense that lasts as long as the victim is held; and (2) if the offense is continuing, whether the evidence supports a finding that Marge Garcia held or aided in holding the victim at any time after May 15, 1981, so as to bring her offense within the five year period. Because the government's theory is that the victim, a young girl named Olga, was held partly by psychological coercion, it is necessary to present the facts in considerable detail.

## FACTS

In the summer of 1975, two sisters, Olga (then age 9) and Nora [1] (then age 10), were visiting a carnival in their home town of Tijuana, Mexico when they were approached by a stranger. The stranger, Marge Garcia, engaged the children in conversation and offered to pay for some carnival rides. After taking them on some rides and after having gained the girls' confidence, Marge offered to give the two sisters a ride home. The girls initially resisted but relented when Marge led them by the hands to a pickup truck occupied by Andro Garcia and the Garcias' two children. When the girls realized that they were not going home they protested. They were told to be quiet or they would be killed and were informed that the Garcias had a gun. They were then transported by the Garcias across the international boundary from Mexico to the United States.

Once across, the victims were taken to the Garcias' home in California. Marge told them: "You don't have parents anymore. We are your new parents. You are never going back." From then on, until their departure, they were subjected to a regimen of physical and sexual abuse. Andro cut their hair very short, forced them to put on make-up and to wear flimsy clothing. While inside the house they were forbidden to wear anything except their underclothes. Marge and Andro had to be addressed as "Mom" and "Dad." Failure to comply was met with a beating. Within a week after their abduction both girls were raped by Andro. Marge was a willful and active participant in these sexual assaults.

Nora attempted to escape shortly after her abduction by slipping out in the middle of the night. Tired and confused, Nora sat

---

* The Honorable Charles Lovell, United States District Judge for the District of Montana, sitting by designation.

1. Only Olga is named as a victim in the indictment because Nora ceased to reside with the defendants in 1979, beyond the limitations period.

on a sidewalk curb and was approached by a woman who spoke to her in English. Nora did not understand her. Police officers were called, but they also did not speak Spanish. While cruising the neighborhood, the officers were approached by Marge who claimed to be the girl's Mother. The police turned Nora over to Marge Garcia. Nora was then taken downstairs to a basement where she was tied to a chair and beaten by Andro. Andro told her, "Don't do this again or we'll kill you." Olga heard her sister's screams from the beating and was later informed of these events by Nora. Following this escape attempt the two girls were often kept separated and were told not to talk to each other.

The girls adopted different survival strategies. Nora, the older sister, resisted actively and so was punished with greater frequency and more severe force. Olga became quiet and withdrawn.

Throughout their confinement the girls were forced to engage in various sexual activities, ranging from oral copulation with Andro to group sex involving both girls, Marge and Andro. Andro also took the girls to farm labor camps and sold their services as prostitutes. Andro would beat the girls if they refused or failed to perform as ordered.

Beatings were administered for any failure to obey commands. Minor transgressions were punished with blows to the chest and stomach. Initially, these incidents occurred at least once a week. Some offenses were punished by extended periods of kneeling while facing a wall. Other punishments included being tied to a chair and beaten by Andro. Both girls were hung up, sometimes upside down, and beaten with a paddle. They were frequently warned by Andro not to escape nor to reveal anything to anybody about their true background. Andro told them that if they ran away he would cut them up into pieces, put them in a box and bury them in the mountains.

At one point Nora was punished very severely for running away. Olga and Nora were taken by the Garcias to a remote garbage dump in the desert. Andro then tied Nora to a tree and blindfolded her. Nora's sister Olga, Marge and the two children were in the car, parked nearby. Andro repeatedly approached Nora and asked "Are you going to run away again?" Nora responded "No" and Andro then struck her with a billy club on the stomach and legs. He then told her, "You're not going to do that anymore and if you do, you're going to be punished." The group then drove away and left Nora tied to the tree by herself. Before leaving, Andro told her that he was leaving her there for the coyotes to eat. Later the group returned. After administering a couple more blows, Andro removed Nora's handcuffs and Nora was allowed to join the others. After this incident the girls were told never to speak Spanish to each other. They were subsequently punished for doing so by being forced to kneel for extended periods of time.

Some time later, Nora told some friends about the abduction. When Andro found out about this he tied Nora to a small table and whipped her with a stretch of electrical cord. Olga witnessed her sister being punched and whipped and heard most of the screams from such beatings. Altogether, Nora attempted to escape at least ten times.

The family moved frequently from place to place within California. While in Fresno, three to four years after the abduction, Nora became friendly with a woman named Emily. Nora related the details of her situation to Emily. Emily helped Nora get away from the Garcias and unsuccessfully attempted to find Nora's parents in Tijuana. Nora's abduction thus ended in 1979.

At different times, both girls were impregnated by Andro. Nora's baby was put up for adoption after her escape. Olga's pregnancy occurred in 1980–81. At that point Marge became jealous of Olga and told Olga that she should leave. Olga finally left the Garcia residence on May 20, 1981. Prior to leaving, Olga was warned by Andro and Marge not to speak to the authorities. She was told that it had been a long time since the abduction, the police would therefore not help, and if Olga did

speak to the police the Garcias would kill her. The story of Olga's kidnapping finally came to light a few years later when Andro Garcia became a suspect in an unrelated abduction.

The district court determined that the confinement of Olga lasted until May 20, 1981, when she was "physically emancipated." It was on that date that Olga permanently departed from the Garcia residence. The indictment was handed down on May 15, 1986, only a few days less than five years later.

## DISCUSSION

### Kidnapping as a continuing offense

■ The Garcias argue that the kidnapping of Olga was complete at the time she was first abducted and transported into California, and that limitations had accordingly run long before the indictment in this case was handed down. The Garcias rely on the absence of any federal authority to the contrary, and the doctrine that "criminal limitations are to be liberally interpreted in favor of repose." *Toussie v. United States,* 397 U.S. 112, 115, 90 S.Ct. 858, 860, 25 L.Ed.2d 156 (1970). We reject the Garcias' argument, however, because it is inconsistent with the common law view of kidnapping, and with the purposes of the federal kidnapping statute. These sources indicate that the crime continues as long as the victim is held.

At common law, the offense of kidnapping originally was the forcible abduction of a person from one country to another. While the carrying away was clearly an important element of the crime, much of the harm was that transportation of the victim had a long-term harmful effect.[2] Subsequently, the involuntary detention of

the victim became the focus of the crime. "[I]t is the pain of confinement that creates a distinct harm worthy of independent punishment for kidnapping. Once the injury being inflicted by an accompanying crime is excluded, the length and condition of the confinement become the principal determinant in measuring the harm which forms the basis for the kidnapping charge." Diamond, *Kidnapping: A Modern Definition,* supra n. 2. When the focus is shifted to the involuntary detention of the victim, the crime of kidnapping necessarily becomes a continuing one.

The Court of Appeal of California was faced with the same issue that we are, and came to the same conclusion. In *Parnell v. Superior Court,* 119 Cal.App.3d 392, 173 Cal.Rptr. 906 (Ct.App.1981), a boy had been abducted and held for seven years. As here, the defendant asserted the defense of limitations. The court stated:

> [A]n examination of the major purposes behind the statute of limitations compels the conclusion that none of its purposes would be advanced by barring prosecution in the instant case.... This is not a crime where in one brief window of time the crime is committed and the perpetrator and victim go their separate ways. Rather, this is a crime of continuing force upon the person, here a minor, while parents and family are kept in a constant state of anxiety. The statute's purpose to protect those who have reformed similarly has no application to the instant case, where petitioner, showing no change of heart, failed to return the child to his parents. In addition, prosecution would deter continued detention of victims; contrariwise, the barring of prosecution would encourage the detention of the victim beyond the limitations period.

**2.** "The term kidnapping emerged in English case law towards the end of the 17th century. It was used to describe the forced recruitment of labor for the American colonies.... The initial common law element of carrying a victim out of the country in the context of 17th century transportation and communities ...

emphasized that the victim would almost inevitably suffer a very lengthy, if not permanent, isolation from his or her normal society. From this perspective, kidnapping was an extreme form of false imprisonment because the isolation was often for the duration of the victim's

*Id.*, at 408–409, 173 Cal.Rptr. at 915–916.[3] All of the same considerations are applicable to this case.

The federal kidnapping statute adds a discrete jurisdictional factor as a requisite to conviction—transportation of the victim across a state or national boundary. From this fact, the Garcias would draw the conclusion that limitations begins to run at the time of transportation. We disagree; the essence of the crime remains the same in the federal statute:

> Whoever unlawfully seizes, confines, inveigles, decoys, kidnaps, abducts, or carries away and holds for ransom or reward or otherwise any person, except in the case of a minor by the parent thereof, when
>
> > (1) the person is willfully transported in interstate or foreign commerce;
>
> . . . . .
>
> shall be punished by imprisonment for any term of years or for life.

18 U.S.C. § 1201(a). As the language of the statute suggests, the crime itself is not changed by its adoption into federal law. What the federal statute added was the possibility of interstate enforcement against mobile kidnappers who were terrorizing the country at the time of the federal statute's enactment. *See United States v. Jackson*, 390 U.S. 570, 588, 88 S.Ct. 1209, 1219, 20 L.Ed.2d 138 (1968). The requirements of transportation of the victim in interstate or foreign commerce was inserted simply to assure federal jurisdiction under Congress' commerce power; it was not an element of the substantive crime itself. *See, e.g., United States v. Napier*, 518 F.2d 316, 319 (9th Cir.), *cert. denied*, 423 U.S. 895, 96 S.Ct. 196, 46 L.Ed.2d 128 (1975). Thus it is "the involuntariness of seizure and detention which is the very essence of the crime of kidnapping." *Chatwin v. United States*, 326 U.S. 455, 464, 66 S.Ct. 233, 237, 90 L.Ed. 198 (1946). We conclude,

therefore, that the crime of kidnapping under 18 U.S.C. § 1201(a) is a continuing offense, and limitations in this case did not begin to run until the victim ceased to be held. The district court did not err in denying the motion to dismiss the indictment on the ground that limitations had run.

*Did Marge Garcia detain the victim within the limitations period?*

Marge Garcia, like Andro, was charged both with kidnapping and with aiding and abetting kidnapping. She challenges the district court's finding that she detained or aided in detaining Olga until Olga departed on May 20, 1981. Marge contends that Olga was free to leave on May 14, 1981. If Marge is correct that she did not detain or aid in detaining Olga after May 14, 1981, then the indictment that was returned on May 15, 1986 was one day too late.

Marge relies on evidence that Olga called the welfare authorities on May 14, 1981, and told them that she would be leaving the Garcia residence and that her welfare checks should be directed elsewhere as of May 31, 1981. Marge also relies on evidence that at some point prior to May 14, 1981, she told Olga that she did not want Olga around the house any more. That statement appears to have been made during Olga's pregnancy, at a point when Marge became jealous of Olga. Finally, Marge points to testimony of Olga that, as of the time she made the telephone call to the welfare authorities, Olga was not being confined against her will by Marge. All of this evidence, according to Marge, establishes that the district court erred in ruling that Marge's criminal participation extended into the period that was not barred by limitations.

■ Marge's argument makes too little of the continuing effect of terror in holding Olga. "The act of holding a kidnaped person for a proscribed purpose necessarily implies an unlawful physical *or mental*

---

life." J.L. Diamond, "Kidnapping: A Modern Definition," 13 Amer.J. of Crim.L. *1, 2–3 (1985).*

**3.** *See also, People v. La Marca*, 3 N.Y.2d 452, 165 N.Y.S.2d 753, 759, 144 N.E.2d 420, 424 (1957), *cert. denied*, 355 U.S. 920, 78 S.Ct. 351, 2 L.Ed.2d 279 (1958) ("Kidnapping, which involves the

detention of another, is, by its nature, a continuing crime."); *Oregon v. Rose*, 75 Or.App. 379, 706 P.2d 583 (Ct.App.1985) (crime of custodial interference is continuing as long as custody is withheld for purposes of statute of limitations).

*restraint* for an appreciable period against the person's will and with a willful intent so to confine the victim." *Chatwin v. United States*, 326 U.S. at 460, 66 S.Ct. at 235 (emphasis added). Olga was abducted at a very tender age. Marge and Andro Garcia subjected her to unspeakable abuse that was intended to have continuing coercive effect. A major part of the government's case consisted of expert testimony on the psychological effects of the physical and mental abuse suffered by Olga. A psychologist expert testified:

> Efforts were made by the abductors to control Olga [ ... ] through physical and psychological methods. This included false promises of safety and security, threats of physical harm, removal from her country of origin, isolation from communication in a common language, substitution of parent figures, removal of clothing and shoes associated with prior life, physical isolation from her older sister, forced sexual abuse, forced violation of conventional mores of sexual behavior, physical beatings and hanging, threats of death, observation and reports of physical and sexual abuse to the older sister, observation and reports of physical and sexual abuse of other natural children in the household, forced labor without compensation, repetitive redefinition of the external world, repetitive redefinition of Olga's self image, demonstration and reports of the consequences of disobedience or attempted escape, and disconcentration/dependence by frequent movement of residence location. These

methods are consistent with methods employed by other child abductors.

This opinion and the evidence upon which it was based are sufficient to sustain the district court's finding that the coercive effects of Andro and Marge's abuse of Olga lasted until Olga physically departed on May 20, 1981.[4]

Marge argues that she was not charged as a conspirator, and that Andro's actions within the limitations period cannot be attributed to her; she herself must have acted criminally during the limitations period. We do not entirely agree. If Marge aided Andro in terrorizing Olga with the intent of forcing Olga to remain involuntarily in the household, and that terror was effective in holding Olga involuntarily until May 20, 1981, then Marge may be found to have aided in holding Olga until that date. This conclusion is not changed even if it was Olga's perception that it was not Marge, but Andro, that kept Olga in fear after May 14, 1981. It is enough if Marge aided Andro in keeping Olga in such fear that she could not leave. There is much evidence to support the view that Marge was a significant participant in the purposeful terrorizing of Olga, by acts intended to have the lasting effect described in the expert testimony. Indeed, Marge does not deny that she helped change the girls' identities, terrorized them with threats of beatings, and helped Andro to rape and sodomize them. At one point when Andro was incarcerated for three months, Marge had sole control over Olga. The effects of her participation, either directly or as an aider and abettor of Andro, could easily be found

---

**4.** We find nothing inconsistent with our conclusion in the Supreme Court's recent decision in *United States v. Kozminski*, ⸺ U.S. ⸺, 108 S.Ct. 2751, 101 L.Ed.2d 788 (1988). In *Kozminski,* the Court held that defendants could not be convicted of holding persons in "involuntary servitude" unless they were "forced to work ... by the use or threat of physical restraint or physical injury," *id.* at ⸺, 108 S.Ct. at 2765, or by law, rather than merely by psychological coercion. That ruling in *Kozminski* was based, however, on the historical meaning of the Thirteenth Amendment and of the statutes that borrowed its language. In any event, there is ample evidence of the use or threat of physical force and physical injury in our case, and the mentally coercing effects of such force are

clearly relevant under the kidnapping statute. *See id.* at ⸺ n. 2, 108 S.Ct. at 2766 n. 2 (concurring opinion of Brennan, J.); *Chatwin,* 326 U.S. at 460, 66 S.Ct. at 235. Even with regard to the statutes prohibiting involuntary servitude, the *Kozminski* opinion stated:

> Our holding does not imply that evidence of other means of coercion, or of poor working conditions, or of the victim's special vulnerabilities is irrelevant in a prosecution under these statutes. As we have indicated, the vulnerabilities of the victim are relevant in determining whether the physical or legal coercion or threats thereof could plausibly have compelled the victim to serve.

*Id.* ⸺ U.S. at ⸺, 108 S.Ct. at 2765.

to have coerced Olga until she finally departed on May 20, 1981.

Of course, Marge could and did attempt to show that she acted to cease her coercion of Olga at some point before May 15, 1981. In view of all of the evidence, however, the district court was not compelled to accept her version of her responsibility for Olga's status from May 15 to May 20, 1981. The district court could find that, despite Marge's possible personal desires to see Olga leave, Marge nevertheless continued to aid and abet Andro in continuing the coercion of Olga until Olga finally departed on May 20, 1981.[5]

Finally, Marge argues that the district court erred in concluding that Olga was held until May 20, 1981, because the district court observed that, even if Olga were free to leave before May 15, 1981, the Garcias had created a situation that made it economically impossible for her to leave. Economic dependence, Marge contends, is not the same as being "held" within the meaning of the federal kidnapping statute. We agree that *mere* economic dependence would not be sufficient, but we do not read the district court's remarks and findings in so limited a fashion. The court, after hearing all of the evidence described above, showing multiple sources of coercion, ruled that Olga was not "physically emancipated" until May 20, 1981. That ruling that she was not physically free to go is supported by the evidence. That Olga's economic dependence might have kept her in the household even if she were physically emancipated does not impugn the court's finding.

## CONCLUSION

The convictions of Andro and Marge Garcia are AFFIRMED.

---

**5.** Andro, for his part, does not contend that the coercive detention of Olga ended before May 20, 1981.