Graffeo, J. (concurring in part and dissenting in part).
I concur with Point I of the majority’s opinion. But I believe the jury’s determination of James Cahill’s guilt of murder in the first degree, based on two statutory aggravating factors—felony murder (see Penal Law § 125.27 [1] [a] [vii]) and witness elimination (see Penal Law § 125.27 [1] [a] [v])—should be up *99 held. In my view, a majority of this Court now rewrites the first-degree felony-murder statute in a manner contrary to the plain language of the provision and clear public policy enacted into law by our elected representatives. Equally disturbing, the majority concludes that the witness elimination murder charge was supported by sufficient proof, yet reverses that conviction without explaining why the jury, which had the ability to assess the credibility of witnesses, could not have found beyond a reasonable doubt that—regardless of whatever else motivated defendant—he intended to eliminate Jill Cahill as a potential witness. In addition, I cannot agree with the majority that the trial court erred in life and death qualification of the prospective jurors and fully concur with Judge Read’s jury selection analysis. I therefore dissent from so much of the majority decision that overturns defendant’s first-degree murder convictions.
I. Penal Law § 125.27 (1) (a) (vii): First-Degree Felony Murder
The majority’s holding that the evidence against defendant was legally insufficient to establish his guilt of felony murder in the first degree rests upon two separate, yet intertwined legal theories: an application of the so-called “merger” doctrine (although the majority does not use that term) and an implicit interpretation of the “in furtherance of’ requirement in the first-degree murder statute. I cannot accept either analysis. There are certain well-settled principles of statutory construction— construing laws in accord with the plain meaning of the language chosen by the Legislature, avoiding irrational results and adopting interpretations that do not undermine the constitutionality of a statute—that this Court adheres to in order to effectuate the legislative intent of a law. These rules should apply in all cases, including capital cases.
The fundamental flaw in the majority’s analysis is its disregard of these rules and of the clear and unequivocal language of the felony-murder aggravator. The majority declines to interpret the statutory provision in accord with its plain language on the basis that it “would have to stretch the statute’s meaning” (majority op at 71). I strongly disagree.
The carefully selected language of the first-degree felony-murder statute should inform the outcome in this case. Penal Law § 125.27 (1) (a) (vii) provides, in relevant part:
“[a] person is guilty of murder in the first degree when . . . [w]ith intent to cause the death of another person, he causes the death of such person or *100 of a third person; and . . . the victim was killed while the defendant was in the course of committing or attempting to commit and in furtherance of robbery, burglary in the first degree or second degree, kidnapping in the first degree, arson in the first degree or second degree, rape in the first degree, sodomy in the first degree, sexual abuse in the first degree, aggravated sexual abuse in the first degree or escape in the first degree, or in the course of and furtherance of immediate flight after committing or attempting to commit any such crime or in the course of and furtherance of immediate flight after attempting to commit the crime of murder in the second degree” (emphasis added).
Our function as judges is to interpret this law. “The governing rule of statutory construction is that courts are obliged to interpret a statute to effectuate the intent of the Legislature” (People v Finnegan, 85 NY2d 53, 58 [1995]). The “ ‘clearest indicator of legislative intent’ ” is the statute itself (People v Robinson, 95 NY2d 179, 182 [2000], quoting Majewski v Broadalbin-Perth Cent. School Dist., 91 NY2d 577, 583 [1998]). If the language chosen by the State Legislature is clear and unambiguous, and “involves no absurdity or contradiction, there is no room for construction and courts have no right to add to or take away from that meaning” (Tompkins v Hunter, 149 NY 117, 123 [1896]; see People ex rel. Harris v Sullivan, 74 NY2d 305, 309 [1989]). When this doctrine is violated, a court impermissibly encroaches upon the legislative and executive domains and thereby violates the foundation of the separation of powers doctrine (see People v Finnegan, 85 NY2d at 58).
The statute encompasses first- or second-degree burglary charges, both of which may be premised upon the intent to commit any crime {see Penal Law §§ 140.25, 140.30). We have recognized that in enacting the burglary and felony-murder statutes, the Legislature “intended that the definition be ‘satisfied if the intruder’s intent, existing at the time of the unlawful entry or remaining, is to commit any crime’ ” {People v Miller, 32 NY2d 157, 161 [1973] [emphasis in original], quoting Denzer and McQuillan, Practice Commentary, McKinney’s Cons Laws of NY, Book 39, at 355). “[A]ny crime” obviously includes murder.
The majority asserts that “the Legislature did not expressly sweep within Penal Law § 125.27 all killings in which the *101 murderer unlawfully entered the victim’s home” (majority op at 65). This is true in one respect—only intentional murders are included, not “all killings” (majority op at 65). But by specifying first- and second-degree burglary in the felony-murder provision, the Legislature certainly intended to include within the ambit of the statute intentional murderers who unlawfully enter another person’s dwelling with the intent to kill (see Penal Law § 125.27 [1] [a] [vii]).
This is consistent with additional language in the statute— the requirement that the murder must occur “in the course of . . . and in furtherance of’ the burglary. To satisfy these elements, the People must prove that the homicide not only occurred during “the course of’ a burglary, but that the killing was logically related to the unlawful intrusion as well. The latter requirement has long been part of New York law. As we explained in People v Wood (8 NY2d 48 [I960]), interpreting a predecessor felony-murder provision:
“a felony murder embraces not any killing incidentally coincident with the felony . . . but only those committed by one of the criminals in the attempted execution of the unlawful end. Although the homicide itself need not be within the common design . . . the act which results in death must be in furtherance of the unlawful purpose” (id. at 51 [emphasis added]).
Significantly, the. Legislature echoed the terminology we articulated in Wood when it added the phrase “in furtherance of’ to the felony-murder statute in 1965. This phraseology was then carried forward in the felony-murder provision of the 1995 death penalty act. Because the Legislature chose to use a phrase first adopted by this Court when it enacted the felony-murder provision in 1965 and then used the identical language in the 1995 capital felony-murder provision, ■ it is reasonable to conclude that the Legislature intended to incorporate the Wood rule into the death penalty statute.
Consistent with Wood, courts have interpreted the “in furtherance of’ element as requiring a logical nexus between a murder and a felony (see People v Lewis, 111 Misc 2d 682, 686 [Sup Ct, NY County 1981] [citing Wood for the proposition that “ ‘in furtherance’ places a relation requirement between the felony and the homicide . . . the nexus must be one of logic or plan”]; see also State v Young, 191 Conn 636, 642, 469 A2d *102 1189, 1193 [1983] [citing Wood: “(w)e agree with the New York courts that the phrase ‘in furtherance of’ was intended to impose the requirement of a relationship between the underlying felony and the homicide beyond that of mere causation in fact, similar to the concept of proximate cause in the law of torts”]).[1] Thus, by requiring that a rational relationship be established between the perpetrator’s actions and the homicide, the Legislature expressed its intent to exclude deaths that are merely coincidental to the occurrence of a felonious event or completely unrelated to a defendant’s purpose or conduct (see People v Hernandez, 82 NY2d 309, 317 [1993]).
Wood therefore established that a murder is logically related to and thereby furthers another crime when, among other possibilities, it is designed to help achieve the purpose of the other crime. In this case, the “unlawful end” (People v Wood, 8 NY2d at 51) that prompted defendant to commit the burglary was the murder of his wife. Thus, under the Wood analysis, the murder of Jill Cahill furthered the unlawful entry into her hospital room.
The majority entirely avoids addressing the “in furtherance of’ requirement and adopts a rule that is inconsistent with this statutory language. Indeed, although the majority asserts that its analysis is “more faithful to the Legislature’s language and design” and is consistent with “the statutory plan” (majority op at 72), it never actually interprets the language of the statute. Nor does it cite any legislative history in support of its conclusions (nothing in the legislative history supports either the conclusion the majority has reached or the untraditional review it engages in to get there). Instead, the majority concludes that if the purpose of a predicate felony is to commit murder, there is no “independent criminal objective” for the felony; the burglary necessarily furthers the homicide but the burglary may not be furthered by the killing. Thus, in the *103 absence of an independent criminal purpose, the majority reasons that the underlying felony is an integral component of the killing and is thereby subsumed within the homicide, precluding a capital felony-murder conviction.
This is, in effect, the “merger” rule that many other states— including New York (see People v Miller, 32 NY2d 157 [1973])— have rejected.[2] Clearly, “there is no logic or reason to preclude a felony murder charge from being based upon a burglary charge that, in turn, is premised upon either an intent to assault or an intent to murder” (People v Lewis, 791 P2d 1152, 1154 [Colo Ct App 1989]; see also State v Tillman, 750 P2d 546, 581 [Utah 1987] [Stewart, Assoc. Ch. J., concurring]). The California Supreme Court—the court that invented this analytical theory—has characterized as “artificial” and “anomalous” the notion that “a felon who acts with a purpose other than specifically to inflict injury upon someone—for example, with the intent to sell narcotics for financial gain . . .—is subject to greater criminal liability for an act resulting in death than a person who actually intends to injure the person of the victim” (People v Hansen, 9 Cal 4th 300, 315, 885 P2d 1022, 1030 [1994]).
The majority contends that the holding in this case does not undermine this Court’s precedent in People v Miller. If this is true, there are now two different “merger” rules in this state— one for first-degree felony murder and one for second-degree felony murder—despite the fact that the language of those statutes is identical in all relevant respects. Before today, those statutes had the same meaning. But where the first-degree murder provision currently reads “burglary in the first degree or *104 second, degree,” in light of the majority’s decision, the statute will now be subject to an additional, judicially-imposed restriction—“except where the underlying intent is to kill”—a particularly strange limitation for a capital murder statute.
The majority adopts this new limitation because it concludes that the statute as written by the Legislature does “not narrow the class of those eligible for the death penalty, but. . . widen[s] it” (majority op at 65). The majority’s conclusion stems from a mischaracterization of the Supreme Court’s narrowing principle and a failure to give weight to the constitutional concept that narrowing must rationally distinguish between defendants who are and are not subject to the possibility of capital punishment.
“[A] capital sentencing scheme must ‘genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder’ ” (Lowenfield v Phelps, 484 US 231, 244 [1988], quoting Zant v Stephens, 462 US 862, 877 [1983]). In other words, states must make “ ‘the death penalty ... an available sentencing option—even potentially—for a smaller class of murders’ ” (Lowenfield v Phelps, 484 US at 245-246, quoting Jurek v Texas, 428 US 262, 271 [1976]) and must make “a principled distinction between those who deserve the death penalty and those who do not” (Lewis v Jeffers, 497 US 764, 776 [1990]; see Gregg v Georgia, 428 US 153, 198 [1976]).
In New York, the Legislature specified certain aggravating factors that a jury must find proven beyond a reasonable doubt before it may consider whether a sentence of death or life without parole is warranted (see Penal Law § 125.27 [1] [a] [i]-[xiii]; CPL 400.27 [11] [a]). Because the first-degree felony-murder statute applies to only intentional murders, it necessarily excludes unintentional felony murders. Thus, the statute restricts death eligibility to limited categories of homicides and identifies a subclass of felony murder for which capital punishment and life imprisonment are authorized.[3]
The Legislature also drew a distinction for aggravating factor purposes between burglary in the first and second degrees, and *105 burglary in the third degree. Burglary in the third degree covers the unlawful entry of any building, even if it is not a dwelling, and does not require that the perpetrator be armed with a weapon (see Penal Law § 140.20). By excluding burglary in the third degree from the class of felonies underlying the capital felony-murder provision, the Legislature indicated its desire to punish more severely illegal entry into dwellings or entry while armed with a dangerous weapon. Thus, in crafting the capital statute, the Legislature fulfilled its narrowing responsibility by incorporating our State’s historic preservation of the sanctity of a home (see e.g. People v Miller, 32 NY2d at 160). Because crimes committed in dwellings can rapidly escalate to violence, the Legislature adopted a reasonable demarcation among possible burglary-murder scenarios. As we determined in People v Harris, it is rational for the Legislature to consider “the inherent potential for violence and physical injury” in making distinctions between capital-eligible and noncapital-eligible offenses (98 NY2d 452, 477 [2002]). By including first- and second-degree burglary as predicate felonies but excluding third-degree burglary, the Legislature did just that: there was a “ ‘meaningful basis for distinguishing the few cases in which (the death penalty) is imposed from the many cases in which it is not’ ” (id. at 476, quoting Gregg v Georgia, 428 US at 198).
The majority overlooks the requirement that narrowing, while necessary, must be rational. Under the majority’s interpretation, an intruder who unlawfully enters a dwelling with the intent to steal—a television, for instance—and intentionally kills an occupant in furtherance of that burglary may be indicted on a capital murder charge. In sharp contrast, an intruder who unlawfully enters a dwelling with the intent to murder—someone like defendant who obtained a toxic chemical known for its ability to kill, violated an order of protection by surreptitiously entering his wife’s hospital room, wore a disguise to avoid detection and, in a face-to-face encounter, poured cyanide down her throat, inducing a particularly painful death—confronts a parole-eligible prison sentence. It is inconceivable that the Legislature intended such an irrational delineation between capital- and noncapital-eligible defendants.
In adopting its “independent criminal objective” rule the majority addresses only felony murder based on burglary. But it is *106 possible that the majority could extend its analysis to other crimes included in the first-degree felony-murder statute, such as kidnapping, arson and robbery, thereby creating additional “merger” distinctions contrary to the clear language of New York’s first-degree felony-murder statute. Did the Legislature intend that a murderer who kidnaps to extort money may face a capital charge, but a murderer who kidnaps in order to transport a victim to a secluded location for the killing falls outside the statute?[4] Or that a defendant who sets fire to a house in order to kill the occupants receives a parole-eligible prison sentence, but a defendant who sets a fire in order to obtain insurance money or to drive the occupants outside and murder them in person can be indicted for first-degree murder?[5]
I therefore question whether the majority’s version of the merger analysis “rationally distinguish[es]” (Spaziano v Florida, 468 US 447, 460 [1984]) between death-eligible defendants on a “principled basis” (People v Harris, 98 NY2d at 476). If additional violent felonies such as kidnapping, arson and robbery were to be excised from the statute along with the class of burglaries the majority excises, few qualifying felony-murder offenses would remain. The majority’s rationale thus creates a potential conflict with our reasoning in People v Harris (98 NY2d at 476-477) where, in response to a constitutional challenge to the felony-murder provision, we held that New York’s death penalty statute was not irrationally underinclusive. There, we noted that “[t]he Legislature made the assessment that the predicate felonies for first-degree felony murder should be those that are potentially the most violent and involve a substantial risk of physical injury,” and concluded that the “decision to exclude felonies of a similar grade, but lacking the inherent potential for violence and physical injury, was . . . rational” (id. at 476, 477). In Harris, we recognized that it was the Legislature’s prerogative to determine, as a matter of public policy, that a certain crime—including, I would argue, the illegal entry of a dwelling with the intent to kill and while armed with a deadly weapon—is a “violent” offense that “involves a substantial risk of physical injury” justifying its inclusion as an aggravating factor for jury consideration (id. at 476). I would adhere to that determination.
*107 Even applying the majority’s new merger rule, I believe there was sufficient proof that defendant committed felony murder in the first degree—he did, in fact, have an independent criminal objective. The majority concedes that its analysis does not apply to a defendant who has more than one purpose for committing the underlying felony (majority op at 65). Thus, a felony-murder conviction will be sustained where the purpose of the predicate felony is not exclusively to kill but also to commit some other offense, such as concealing evidence of another crime (see People v Mendoza, 24 Cal 4th 130, 183-184, 6 P3d 150, 183 [2000]).
In this case, the majority holds that the evidence was legally sufficient to prove that one of the reasons defendant killed his wife was to eliminate her as a witness to the April assault (majority op at 59)—a point with which I concur. That determination necessarily means that the evidence was sufficient to prove several, lesser included felony offenses, including tampering with a witness in the first and second degrees (Penal Law § 215.13 [1]; § 215.12 [1]), and intimidating a victim or witness in the first and second degrees (Penal Law § 215.17 [1]; § 215.16 [1]). Hence, defendant intended to commit the crime of tampering with a witness in the first degree by “intentionally caus[ing] serious physical injury to” Jill Cahill “for the purpose of . . . preventing . . . the giving of testimony in a criminal proceeding by [her]” (Penal Law § 215.13 [1]). The majority does not dispute that the People offered sufficient evidence that, at the moment defendant unlawfully entered Jill Cahill’s hospital room, he possessed the intent to commit crimes that require “a felonious intent independent of the murder” (majority op at 64). This is precisely the “double crime—murder ‘plus’ ” that the majority claims is required for first-degree felony murder (majority op at 64).
For all of these reasons, I cannot join the majority’s discussion of the first-degree felony-murder provision. The majority’s analysis is undeniably contrary to the language in the statute, produces irrational results and fails to give proper weight to the principled narrowing choices made by the Legislature. In my view, it is evident that the Legislature intended to apply the felony-murder rule to egregious cases like this. Even if I disagreed with that legislative determination, my personal belief as to whether this defendant is an appropriate candidate for first-degree murder would be irrelevant for one very basic reason—I am a judge, not a legislator.
*108 II. Penal Law § 125.27 (1) (a) (v): Witness Elimination Murder
The majority sets aside defendant’s conviction of witness elimination murder because it believes that the jurors, who had the opportunity to see and hear the witnesses and assess their credibility, failed to properly evaluate the evidence presented at trial. In doing so, the majority substitutes its view of the evidence, based on the cold record, for that of the jurors who sat in judgment of defendant. Because I cannot agree that the jury failed to properly weigh the evidence in this domestic violence case, I would uphold defendant’s conviction under Penal Law § 125.27 (1) (a) (v).
According to the majority, a critical factor in assessing the weight of the evidence in this case is whether “defendant thought he could avoid an assault conviction by murdering Jill” (majority op at 62). The witness elimination statute, however, is unconcerned with the probability of a conviction. The plain language of the statute requires only proof that the murder was committed to “prevent[ ] the intended victim’s testimony” (Penal Law § 125.27 [1] [a] [v]).[6] Our task is to determine whether the jury’s assessment of this statutory requirement was against the weight of the evidence.
People v Bleakley (69 NY2d 490 [1987]) provides the standard for weight of the evidence review:
“If based on all the credible evidence a different finding would not have been unreasonable, then the appellate court must, like the trier of fact below, ‘weigh the relative probative force of conflicting testimony and the relative strength of conflicting inferences that may be drawn from the testimony’ . . . . If it appears that the trier of fact has failed to give the evidence the weight it should be accorded, then the appellate court may set aside the verdict” (id. at 495).
This is not an open invitation for a court to substitute its judgment for that of the jury. Bleakley commands that “[g]reat deference” be accorded to the jury’s resolution of factual issues (id.), a principle the majority fails to even mention. Deference is an integral ingredient of the weight of the evidence analysis *109 because it is the “fact-finder[ ]” that has the “opportunity to view the witnesses, hear the testimony and observe demeanor” (id.).
Thus, although an appellate court engaging in weight of the evidence review has been described as fulfilling the role of a “thirteenth juror” (see Tibbs v Florida, 451 US 31, 42 [1982]; People v Rayam, 94 NY2d 557, 560 [2000]), this shorthand is not a literal description of the court’s appropriate analytical process. To the contrary, there are “[w]ithout question . . . differences between what the jury does and what the appellate court does in weighing evidence” (People v Bleakley, 69 NY2d at 495), which is apparent given that a jury’s ability to assess credibility and weigh competing inferences is far superior to that of an appellate court working with only a “printed record” (People v Cohen, 223 NY 406, 423 [1918]). Jurors use all of their senses to evaluate testimony and evidence presented at trial—only they “are able and entitled to assess, at first hand, the credibility and reliability of the witnesses” because they have the opportunity to actually see, hear and feel the evidence in person (People v De Tore, 34 NY2d 199, 206 [1974]). A healthy respect for the jury’s unanimous assessment of the evidence is therefore a necessary component of a proper weight of the evidence review.
Applying the Bleakley standard in its entirety, I cannot concur with the majority’s conclusion that the jury verdict on the witness elimination count was against the weight of the evidence. The People presented compelling evidence that defendant intentionally killed his wife to prevent her from challenging his version of “the truth” about the circumstances leading to the assault on April 21, 1998. As the majority recognizes, the evidence overwhelmingly established that defendant intended to kill Jill when he assaulted her with a baseball bat, crushing her skull. But defendant offered a different explanation at the time of the assault and at trial, claiming that Jill attacked him first and he initially responded in self-defense.[7] This is the factual *110 rendition of the assault that defendant wanted the world to hear and believe.
Yet, Jill Cahill survived the first attack. Over the next six months, she fought back from the brink of death to the point that she was able to respond and speak. The testimony of medical personnel and her family members clearly relayed to the jury that Jill was beginning to communicate in October 1998. What would she have testified to had she been given the chance—that she did not attack defendant with a knife and initiate the assault? We will never know. But we do know that, once defendant learned Jill could speak—after his mother visited Jill in the hospital in October 1998—he immediately executed his plan to permanently prevent her from attempting to contradict his account of “the truth.”
In overturning the jury verdict on this count, the majority overlooks a number of significant facts and fails to identify the important connections between them that the jury may have found determinative. During the May 11, 1998 Family Court hearing, an assistant district attorney announced the People’s intention to indict defendant for the April assault and advised defendant that his children were potential witnesses. The same day, defendant began to search the Internet for Web sites relating to “cyanide.” Approximately one week later, defendant was present for another Family Court proceeding and learned that his children would undergo psychological evaluation. These impending interviews gave defendant reason to believe that his *111 children would be questioned about the assault on their mother and the effect that it had on them. This had the potential to elicit additional information regarding the events surrounding the assault. After the Family Court appearance, defendant returned home and searched the Internet for information on “ordering potassium cyanide.”
The timing of pertinent events—when defendant actually ordered the cyanide, when he obtained it, and when he used the poison—forcefully establishes that defendant’s actions were inextricably related to the prosecution of the assault charges. Between the date defendant was arraigned on an indictment charging him with three counts of first-degree assault and his next court appearance, defense counsel and the prosecutor had “numerous conversations” about the case, including plea negotiations. Defendant’s decision to order cyanide on the forged letterhead of a local manufacturing company on July 8 occurred only a day before the People’s plea offer was officially placed on the record. The offer, under which defendant would have had to serve at least 10 years in prison, was not accepted by defendant, making a trial increasingly certain.
Most importantly, although defendant intercepted the shipment of cyanide on July 17 by approaching the delivery person and taking possession of the package from the supplier he had contacted, he did not use the poison to kill his wife until three months later. Why? The evidence presented to the jury pointed to a logical explanation: defendant did not execute his homicidal plan until he was able to confirm that Jill was conscious and had recovered sufficiently to be a “threat.”
Defendant’s mother supplied defendant (and the jury) with the information that provided the impetus for him to carry out Jill’s murder.[8] During a visit with Jill Cahill in the hospital on October 5, Mrs. Cahill observed a “conversation” between Jill and two nurses. Significantly, Jill actually spoke to the nurses. Defendant’s mother told her son about these “physical observations” of Jill about two weeks later. Defendant’s response to his mother demonstrates that he appreciated the significance of this information and knew that Jill was regaining her ability to communicate: “ T hope that when this is all concluded that she can tell the truth about what led to the break-up’ of the[ ] marriage.” For the first time since the April assault, defendant *112 became aware that Jill could speak and, therefore, posed a threat as a possible witness against him at trial. Defendant immediately put his murderous plan into action.
Within days of learning of Jill’s improved condition and ability to speak, defendant—disguised as a janitor—was found in Jill’s hospital room by a nurse’s assistant. He quickly departed without incident but returned one week later, again in disguise. This time he was able to bring his plan to fruition—he murdered Jill by poisoning her with cyanide. Defendant had successfully eliminated the primary witness to the April baseball bat attack.[9] A hearing to determine whether defendant’s confessions could be used at the assault trial was only days away.
Giving due deference to the jurors’ assessment of the evidence presented, this sequence of events amounted to compelling evidence supporting the conclusion the jury unanimously reached—defendant killed Jill Cahill to prevent her from communicating with the authorities and testifying at the impending assault trial. The trigger for the murder was defendant’s awareness of the fact that Jill had regained her ability to speak, and with that ability, Jill may have refuted defendant’s account of the events on the night of the assault.
Indeed, no other rationale accounts for defendant’s timing in carrying out his plan for murder. The majority posits that defendant was motivated “to poison his wife because their marriage and family life were being destroyed, not because he wanted to kill a witness to the assault case” (majority op at 59-GO). Defendant may have been motivated to kill because of the deterioration of his family life but the proof does not support the conclusion that this was his only motivation. And what other evidence was presented to the jury to explain why defendant waited three months after he acquired cyanide to carry out his plan to poison Jill? If it was only hatred and family disruption that impelled defendant’s murderous intent, why didn’t he attempt to kill Jill in August after his parents surrendered custody of the children to Jill’s parents, further removing him from his children? In the absence of any plausible reason *113 explaining why defendant waited until mid-October to attempt to administer the cyanide—notably, just a day or two after his mother informed him of Jill’s improved condition and shortly before the pretrial Huntley hearing scheduled for November 2—the jury was entitled to conclude that defendant’s motivation was to prevent Jill from communicating her version of the facts underlying the assault. Hence, the jury could reasonably infer that, whatever else may have driven defendant to take Jill’s life, he intended to eliminate Jill as a witness. Therefore, giving “[g]reat deference” to the jury’s findings (People v Bleakley, 69 NY2d at 495), I conclude that defendant’s conviction of witness elimination murder was not against the weight of the evidence.
The majority’s reasons for disregarding the jury’s resolution of these issues focus on facts that were not known to defendant and therefore shed no light on his motivation. For example, there is no basis in the record to suppose that defendant was aware about the fact the majority finds “[m]ost compelling[ ]”— that Jill had never been interviewed by the police or a prosecutor (majority op at 60)—nor was there any proof that defendant knew whether Jill had or had not retained her memory of the events surrounding the assault (majority op at 60). These facts are meaningless to the witness elimination analysis because defendant’s motives for acting could not have been influenced by that which he did not know. What is pertinent is that the jury heard evidence permitting the inference that defendant believed Jill posed a risk and he killed her to prevent her from testifying.
Similarly unavailing is the majority’s decision to discount the importance of the evidence provided by defendant’s mother. The majority claims that her “testimony does not even suggest, let alone reveal, what defendant knew about Jill’s condition and speaking ability” (majority op at 61). That assertion is not borne out in the record. Defendant’s mother testified that she told defendant about her observations of Jill’s physical condition. This testimony came moments after she described to the jury what she had observed—that Jill spoke to the nurses. It is irrelevant that “we do not know what Jill said” (majority op at 61)—what is significant is that Jill could communicate and defendant was aware of this critical fact.
The majority also places undue emphasis on its conclusion that “there is scant basis to believe that defendant thought he could avoid an assault conviction by murdering Jill” (majority *114 op at 62). The witness elimination statute does not require proof that defendant intended to avoid a criminal conviction. Rather, the statute requires only that a defendant seeks to “prevent[ ] the intended victim’s testimony” (Penal Law § 125.27 [1] [a] [v]). The facts of this case highlight the difference between the plain language of the statute and the majority’s interpretation. It is true that defendant admitted that he beat Jill with a baseball bat during the April assault, although this was not a full confession since defendant maintained he did so in self-defense. The prosecution clearly had a “powerful case without Jill’s testimony” (majority op at 61)—defen-dant confessed to wounding himself and acknowledged striking Jill after she had been incapacitated, thereby severely undermining if not “foreclosing any plausible claim of self-defense” (majority op at 61). But in order to convict defendant of witness elimination murder, the jury was not required to find that defendant hoped (either reasonably or unreasonably) that by killing Jill he could avoid a criminal prosecution. The jury had only to conclude that defendant intended to prevent her testimony.
In this case, the jury could logically infer from all the evidence that defendant was driven by a desire to convince everyone, including his children, that Jill initiated the incident; that she attacked him with a knife; and that, in the course of protecting himself, defendant simply “snapped.” This is the story defendant told the police in April 1998 and this is the explanation that was ultimately presented to the jury. While this account would not avoid a criminal prosecution and might not engender jury leniency sufficient to produce an acquittal— and it did not in this case—defendant did succeed in preventing the jury from hearing the whole story. With Jill’s death, defendant knew that there would be no one left to directly dispute his version of the events on the night of the assault. Defendant committed the ultimate act of domestic violence and, by killing the prime witness, he also impeded the truth-seeking function of a trial, which is precisely why witness elimination murder is among the crimes most strongly condemned in New York State. In my view, if we faithfully apply the weight of the evidence standard of review in this case and give deference to the jury’s unanimous finding, there is no basis to set aside defendant’s conviction of witness elimination murder in the first degree (see Penal Law § 125.27 [1] [a] [v]).
III. Conclusion
The extreme disagreement that envelops the members of this Court stems from three general ideas and differing philosophies *115 about how we should exercise the power that the State Constitution vests in this institution. By failing to respect the plain language of the first-degree felony-murder provision, the majority has substituted its “wisdom” and public policy choices for those of the Legislature when it enacted the statute. The majority also rejects the jury’s assessment of the probative value of the evidence and the reasonable inferences derived therefrom. Finally, the majority sets aside the conclusions reached by the Trial Judge, who had the ability to actually see and hear the prospective jurors discuss their ability to fairly consider possible sentences, reinterpreting the statements made during the life and death qualification process from the cold record. In this case, I would respect, rather than second guess, the life/death qualification assessments of the Trial Judge, the factual findings of the jury and the public policy choice made by the Legislature.
Accordingly, I would affirm both first-degree murder convictions. Due to the majority’s holding in this case, it is unnecessary for me to address the penalty phase issues raised in defendant’s brief and I therefore express no view on those issues or the propriety of the sentence imposed.
Read, J. (concurring in part and dissenting in part). In order to reverse defendant’s conviction for murder in the first degree under Penal Law § 125.27 (1) (a) (vii) (capital felony murder, here predicated on burglary in the second degree), the majority rewrites clear statutory language and disregards our 30-year-old precedent in People v Miller (32 NY2d 157 [1973]). The majority also discovers jury selection error where none reasonably exists. I respectfully dissent.
I. The Burglary Aggravating Factor
The People charged defendant with first-degree felony murder, for which the underlying felony was second-degree burglary. As relevant here, first-degree felony murder occurs when a defendant, “[w]ith intent to cause the death of another person, . . . causes the death of such person . . . ; and . . . the victim was killed while the defendant was in the course of committing . . . and in furtherance of . . . burglary in the . . . second degree” (Penal Law § 125.27 [1] [a] [vii]). In turn, and again as relevant here, “[a] person is guilty of burglary in the second degree when he knowingly enters or remains unlawfully in a building with intent to commit a crime therein, and . . . [t]he building is a dwelling” (Penal Law § 140.25 [2]).
*116 The People contend that defendant committed burglary in the second degree because he “knowingly enter [ed]” or “remain[ed] unlawfully” in his wife’s “dwelling,” her hospital room (it was after visiting hours; an order of protection forbade defendant from seeing his wife, although he contests notice of it) “with intent to commit a crime therein”; namely, intentional murder. Further, “inten[ding] to cause [her] death,” and “caus[ing] [her] death,” defendant killed his wife while “in the course of committing” and “in furtherance of” the burglary when he forced potassium cyanide down her throat as she lay virtually helpless on her hospital bed. Hence, the People argue, defendant committed first-degree felony murder, a capital offense in this case. The jury agreed.
Defendant contests his conviction for first-degree felony murder on two grounds. First, he argues that the phrase “in furtherance of’ in Penal Law § 125.27 (1) (a) (vii) requires a murder to “advance” or “facilitate” the commission of the predicate felony. In the circumstances of this case, he contends, it is logically impossible for the murder to “advance” or “facilitate” the burglary because the two crimes share the identical criminal objective, intentional murder.
Second, principally relying on People v Green (27 Cal 3d 1, 609 P2d 468 [1980]), defendant asserts that absent an independent criminal objective, the burglary “merged” into the murder; therefore, the burglary cannot serve as an aggravating factor without contravening the Eighth Amendment’s mandate that any aggravating factor must genuinely narrow the class of defendants eligible for a capital sentence.
The majority skirts defendant’s “in furtherance of’ argument and, instead, grounds its opinion on the felony murder merger (or “merger”) doctrine, holding that the burglary aggravating factor may not be predicated solely on the intent to commit intentional murder. The majority reaches this conclusion principally (it would appear) because of an inability to believe that the Legislature meant what it actually said {see majority op at 65).
Further, the majority labors mightily to slip the strictures of our precedent by belittling Miller as a traditional, not a first-degree, felony murder case, which dealt with an assaultive, not *117 murderous intent.[1] Then the majority treats the holding in Miller as virtual dictum since the two concurring judges—although obviously unsuccessfully—promoted a narrower basis for reaching the result. Finally, the majority relies on Arkansas and Delaware cases; and, while pointing out the Legislature’s unquestioned resolve to enact a death penalty statute satisfying the requirements of the Eighth Amendment as enunciated in Gregg v Georgia (428 US 153 [1976]), extensively discusses Green, a case in which the California Supreme Court judicially narrowed that state’s circa-1970’s capital felony murder “special circumstance” to conform with Gregg.
A. Statutory Interpretation
First and foremost, this case presents us with a pure issue of statutory interpretation. As a general rule, “[t]he primary consideration of courts in interpreting a statute is to ‘ascertain and give effect to the intention of the Legislature’ ” (Riley v County of Broome, 95 NY2d 455, 463 [2000], quoting McKinney’s Cons Laws of NY, Book 1, Statutes § 92 [a], at 177). Moreover, the plain meaning of the statutory text is the best evidence of legislative intent and, in fact, the only authoritative basis for interpretation {Riley v County of Broome, 95 NY2d at 463 [“Of course, the words of the statute are the best evidence of the Legislature’s intent. As a general rule, unambiguous language of a statute is alone determinative”]).
Reiterating the statutory language relevant here, a defendant commits first-degree felony murder when “[w]ith intent to cause the death of another person, he causes the death of such person . . . ; and . . . the victim was killed while the defendant was in the course of committing . . . and in furtherance of . . . burglary in the . . . second degree” (Penal Law § 125.27 [1] [a] [vii]). Further, a defendant “is guilty of burglary in the second degree when he knowingly enters or remains unlawfully in a building with intent to commit a crime therein, and . . . [t]he building is a dwelling” (Penal Law § 140.25 [2]).
Obviously, nothing in the wording of the first-degree felony murder statute in any way limits the type of crime that a burglar must intend to commit or, put another way, excludes *118 intentional murder as the sole criminal objective of a second-degree burglary. Belatedly, the second-degree burglary statute manifestly fails to limit the type of crime that a burglar must intend to commit or to exclude intentional murder from those crimes.
Moreover, we have—until today—always construed the second-degree burglary statute as broadly as its unambiguous language demonstrates the Legislature intended (see e.g. People v Mackey, 49 NY2d 274, 279 [1980] [holding that a defendant charged with burglary in the second degree is not entitled to a bill of particulars specifying which crime he intended to commit within the building since “the Revised Penal Law’s definition of burglary is satisfied if the intruder’s intent, existing at the time of the unlawful entry or remaining, is to commit any crime” (internal quotation marks omitted; emphasis added)]). We must presume that the Legislature was aware of our decisions interpreting the second-degree burglary statute as broadly as its words naturally allow (see e.g. People v Robinson, 95 NY2d 179, 184 [2000]).
Further, when “words hav[e] a precise and well settled legal meaning in the jurisprudence of the state[, they] are to be understood in such sense when used in statutes, unless a different meaning is plainly indicated” (McKinney’s Cons Laws of NY, Book 1, Statutes § 233, at 396 [emphasis added]). For the “different meaning” to which the majority subscribes to have been “plainly intended” here, the Legislature would have to have (as it easily could have) drafted the first-degree felony murder provision to exclude burglary predicated on intentional murder from its ambit. That the Legislature did not make this particular drafting choice is telling in light of the numerous ways in which the first-degree felony murder provision was, in fact, limited or, in the language of Gregg, “narrowed” by the Legislature.
That is, the Legislature created the first-degree felony murder provision by borrowing the language of the second-degree felony murder provision, with its well settled legal meanings, and then limiting or narrowing this language in several key respects. Most importantly, first-degree felony murder, unlike second-degree felony murder, requires an intentional killing. First-degree felony murder also provides for more limited acces *119 serial liability;[2] and includes a predicate felony not found in the second-degree felony murder provision; namely, an intentional killing while in immediate flight from attempting second-degree murder.
Significantly, the Legislature also cut back on the underlying felonies upon which first-degree (as opposed to second-degree) felony murder may be predicated, including, as is especially relevant for present purposes, the types of burglary. That is, second-degree felony murder may be predicated on any degree of “burglary,” while first-degree felony murder can rest only on first- or, as in this case, second-degree burglary. By excluding third-degree burglary (which references entry into a building), the Legislature deliberately limited first-degree felony murder to those burglaries that expressly involve invasions of a dwelling, the place where a citizen reasonably expects to be most secure and is, in fact, most vulnerable to serious injury or death when cornered by an intruder bent on murder, as happened here.
In short, the Legislature, while carefully limiting the scope of the first-degree felony murder provision with respect to the types of burglary covered, otherwise did not see fit to exclude a burglary committed with intentional murder as its criminal objective. While the majority may find this hard to accept, the choice is the Legislature’s—not ours—to make.
B. Merger and the Miller Case
The felony murder merger doctrine—a judicial gloss developed in the context of traditional (that is, unintentional) felony murder—bars felony murder when the predicate felony is subsumed in the homicide. With the advent of the revised Penal Law, we cast off merger in Miller. By holding that first-degree felony murder predicated on burglary must have a criminal objective independent of intentional murder, the majority has now revived (and, in fact, expanded) merger in our jurisprudence in ways that the Legislature could never have anticipated.
*120 1. The Scope of the Merger Doctrine in New York
We developed and discussed our own distinctive brand of merger in several key cases decided in the late nineteenth and early twentieth centuries, when felony murder, even if unintentional, was punishable by death. In Buel v People (78 NY 492 [1879]), the defendant, who apparently strangled his victim while raping her, contended that the felony (the rape) merged with the homicide since violence was a requisite element of the rape; therefore, the defendant argued, the rape was not a separate and distinct offense from the killing and so the judge should not have instructed the jury on felony murder.[3] We disagreed: “While force and violence constitute an important element of the crime of rape, they do not constitute the entire body of that offence. The unlawful or carnal knowledge is the essence of that crime; and without this, no matter what degree of force or violence may be employed, rape is not established” (id. at 497 [emphasis added]).
The defendant in People v Huter (184 NY 237 [1906]), after fleeing from premises in which he had committed a burglary, shot and killed a police officer who was pursuing him. When the defendant was convicted of felony murder predicated on burglary,[4] we were asked to review. Concluding that the defendant had ceased to be engaged in the commission of a burglary at the time of the murder, we reversed the judgment and conviction. We then turned our attention to the “much mooted” question of whether the assault in which the defendant was engaged at the time of the killing merged into the homicide, a question that would “doubtless” come up upon retrial (id. at 242-243).
*121 Citing Buel, we stated that “[i]n order ... to constitute [felony murder], . . . the violence may constitute a part of the homicide, yet the other elements constituting the felony in which [the defendant] is engaged must be so distinct from that of the homicide as not to be an ingredient of the homicide, indictable therewith or convictable thereunder” (Huter, 184 NY at 244 [emphasis added]).
In People v Wagner (245 NY 143 [1927]), the proprietor of a boarding house detected a lodger acting suspiciously. When she confronted the lodger outside the bathroom on the boarding house’s second floor, he suddenly struck her in the head with a “blackjack.” The proprietor cried out for help, and another occupant of the boarding house rushed to her assistance. The rescuer struck the defendant a blow, and the proprietor broke free and ran down the stairs and out the front door, shouting for help. She heard shots and ran back into the boarding house and upstairs, where she saw the defendant and her rescuer lying side by side on the floor. When the proprietor took off her shoe and began to beat the defendant about the head with it, he arose, struck her in the face and made his escape. Her rescuer died of gunshot wounds that the defendant had inflicted on him.
The trial court, among other things,[5] charged the jury that defendant was guilty of felony murder[6] if he killed the victim while engaged in a felonious assault upon either the victim or the proprietor. Citing Huter, we held that the trial court erred in charging the jury regarding the assault on the victim, which was an “ingredient” of the resulting homicide and therefore not an independent crime. The error was harmless, though, because the homicide was committed when the felonious assault on the proprietor was still in progress, and this assault was an independent felony.
Our decision in Wagner also relied on People v Patini (208 NY 176 [1913]), another case in which a Good Samaritan intervened in an assault on someone else only to lose his own life {see also People v Giblin, 115 NY 196 [1889] [wife killed when she rushed *122 into store to assist her husband, who was scuffling with gunman who had shot him in altercation over payment for purchases]). Patini, which involved a felonious assault upon the brother of the victim, was grounded at least in part on our interpretation of the word “otherwise” in section 1044 (2) of the former Penal Law to “include [ ] a felony upon a person other than the one killed” (Patini, 208 NY at 178; see also People v Miles, 143 NY 383 [1894]).
In People v Moran (246 NY 100 [1927]), the defendant, after he and his companions were halted by two policemen, drew a revolver and fired two shots at one officer and a third at the other, killing them both. The trial judge charged the jury upon the single theory of felony murder, which we held to be error in light of the merger doctrine. That is, if, as was charged, the defendant shot the second officer while trying to escape after having shot the first officer, then the first felony—the assault upon the first officer—was over, while the second felony—a felonious assault upon the second officer—was not independent of the homicide, “[fit was the homicide itself’ (id. at 103).
With Chief Judge Cardozo speaking for a unanimous Court, we explained the purpose of the merger doctrine:
“Homicide is murder in the first degree when perpetrated with a deliberate and premeditated design to kill, or, without such design, while engaged in the commission of a felony. To make the quality of the intent indifferent, it is not enough to show that the homicide was felonious, or that there was a felonious assault which culminated in homicide.
Such a holding would mean that every homicide, not justifiable or excusable, would occur in the commission of a felony, with the result that intent to kill and deliberation and premeditation would never be essential. The felony that eliminates the quality of the intent must be one that is independent of the homicide and of the assault merged therein, as, e.g., robbery or larceny or burglary or rape” (id. at 102 [emphasis added and citations omitted]).
In other words, the merger doctrine prevented prosecutors from using felony murder to sidestep proof of a culpable mental state in the majority of cases.
Next, the jury in People v La Marca (3 NY2d 452 [1957]) convicted the defendant, who kidnapped a one-month-old infant later found dead in a wooded area, of kidnapping and of having *123 killed the infant while engaged in the commission of the kidnapping. The defendant urged that the felony murder count should have been dismissed because the acts constituting the kidnapping merged into the homicide.
In rejecting this argument, we first noted that while other jurisdictions limited felony murder to specified felonies, our Legislature had chosen a different path, decreeing a homicide to be a capital offense if perpetrated in the commission or attempted commission of any felony. As a result, “[o]ne necessary qualification . . . engrafted” by us on New York’s felony murder rule was the merger doctrine; i.e., “that the underlying felony must be independent of the homicide” because “otherwise, every homicide, not justifiable or excusable, would occur in the commission of a felony—namely, the assault which ended in death—with the result that premeditation, deliberation and intent to kill would never have to be established” (id. at 465). We cited Huter, Wagner and Moran for this proposition.
We reasoned in La Marca that the underlying felony of kidnapping was independent of the murder. Just as in Buel, while force and violence were an important element of the kidnapping, its “essence” was something altogether separate, i.e., “[a] taking or detaining of the infant with intent to keep or conceal ... or to extort . . . money” (La Marca, 3 NY2d at 466).
To sum up, the merger doctrine developed as a limitation that we “engrafted” on felony murder in order to maintain distinctions between culpable mental states. This was necessary because the felony murder statutes at the time encompassed assault as a predicate crime, potentially converting every homicide into capital felony murder since assault is an “ingredient” of every homicide. We consistently declined to expand merger to crimes in addition to assault since the “essence” of crimes such as rape, kidnapping, robbery, larceny or burglary is independent of the homicide.[7] In several cases, we sustained a conviction for felony murder notwithstanding merger when the underlying assault was committed on someone other than the murder victim. *124 This result, however, was premised at least in part on language (the word “otherwise”) appearing in both section 183 of the Penal Code and its successor provision, section 1044 (2) of the former Penal Law. Thus, the status of our merger jurisprudence in 1973 when we decided Miller.

2. People v Miller

Miller barged uninvited into Fennell’s apartment to assault him with a spray can (apparently to disable him with choking gas) and a butcher knife, and wound up killing Fennell’s roommate, Aleem, who came to Fennell’s aid. In other words, the facts were essentially indistinguishable from those of our Good Samaritan cases, such as Wagner, Patini and Giblin (see also People v Luscomb, 292 NY 390 [1944]). The statute under which Miller was prosecuted was, however, quite different as was the People’s theory.
Miller was indicted for and convicted of, among other things, felony murder predicated on burglary to commit an assault. The trial court set aside this conviction on the ground that the People had not established burglary. The trial court, the majority in the Appellate Division and Miller all subscribed to the view that assault, the target crime of the burglary, was actually the underlying felony; therefore, the conviction could not stand because the felony murder statute, Penal Law § 125.25 (3), did not list assault as a predicate crime. Accordingly, we phrased the issue upon appeal as “whether a burglary based upon the crime of assault can properly serve as the predicate for a felony-murder conviction” (Miller, 32 NY2d at 158).
As we correctly saw it, Miller was urging us to “extend” the merger doctrine so that neither the assault against Fennell nor the assault against Aleem would qualify as the target crime of the burglary. This we refused to do, noting that the considerations prompting us to “announce” the merger doctrine in the first place were no longer germane because the Legislature had amended the Penal Law to remove the “fundamental defect” that merger was designed to cure (id. at 159).
Specifically, under the old felony murder statutes (section 1044 [2] of the former Penal Law and its predecessors) any felony, including assault, could be the predicate for murder. Thus, “[s]ince, a fortiori, every homicide, not excusable or justifiable, occurs during the commission of assault, every homicide would constitute a felony murder” (Miller, 32 NY2d at 160). The Legislature remedied this “fundamental defect” in the *125 revised Penal Law (Penal Law § 125.25 [3]), however, by enumerating specific felonies, not including assault and “all involving violence or substantial risk of physical injury,” which were the predicate crimes for felony murder (id.). “The legislative purpose for this limitation was ‘to exclude from felony murder, cases of accidental or not reasonably foreseeable fatality occurring in an unlikely manner in the course of a non-violent felony’ ” (id. [citation omitted]).
We further described—in detail—the Legislature’s obvious motivation or purpose for including burglary in the list of enumerated predicate crimes for felony murder:
“[P]ersons within domiciles are in greater peril from those entering the domicile with criminal intent, than persons on the street who are being subjected to the same criminal intent. Thus, the burglary statutes prescribe greater punishment for a criminal act committed within the domicile than for the same act committed on the street. Where, as here, the criminal act underlying the burglary is an assault with a dangerous weapon, the likelihood that the assault will culminate in a homicide is significantly increased by the situs of the assault. When the assault takes place within the domicile, the victim may be more likely to resist the assault; the victim is also less likely to be able to avoid the consequences of the assault, since [the] paths of retreat and escape may be barred or severely restricted by furniture, walls and other obstructions incidental to buildings. Further, it is also more likely that when the assault occurs in the victim’s domicile, there will be present family or close friends who will come to the victim’s aid and be killed” (id. at 160-161).
Since the Legislature “did not exclude from the definition of burglary, a burglary based upon the intent to assault, but intended that the definition be ‘satisfied if the intruder’s intent, existing at the time of the unlawful entry or remaining, is to commit any crime’ ” (id. at 161 [citation omitted; emphasis in original]), we concluded that any burglary, even one premised on an intent to assault, could support a felony murder conviction.
Tellingly, in Miller we also expressly “reject[ed]” the “reasoning and holding” of People v Wilson (1 Cal 3d 431, 462 P2d 22 [1969]) (Miller, 32 NY2d at 161 n 3). Along with its California *126 progeny, Wilson anchors the majority’s holding that capital felony murder predicated on burglary must have a criminal objective independent of intentional murder.
In Wilson, the defendant, armed with a shotgun, broke a glass window in the outside door of his estranged wife’s apartment building and entered her apartment, where she and three men were present. Initially, the defendant shot two of the men, killing one. He placed the muzzle of his shotgun against the door of the bathroom into which his wife had fled in a futile search for refuge, and shot the door off its hinges. The defendant’s wife was found dead in the bathtub, having been shot twice in the chest at close range.
The defendant was eventually found guilty of first-degree felony murder of his wife based on the crime of burglary, and second-degree felony murder of the other victim, based on assault with a deadly weapon.[8] The California Supreme Court reversed both convictions with merger as the rationale.
As to the second-degree felony murder count, this result followed directly from traditional merger principles, adopted by the court in People v Ireland (70 Cal 2d 522, 539-540, 450 P2d 580, 589-590 [1969] [second-degree felony murder improperly predicated on crime of assault with a deadly weapon because this felony was an integral part of the homicide]). The court reversed the first-degree murder count because the burglary was not independent of the assault, however, and thereby expanded merger. Moreover, in support of this expansion, the court purported to follow New York merger doctrine.
Specifically, the court noted that in Ireland (70 Cal 2d at 540, 450 P2d at 591) it had overruled, in relevant part, People v Hamilton (55 Cal 2d 881, 901, 362 P2d 473, 485 [1961]) and People v Talbot (64 Cal 2d 691, 703, 414 P2d 633, 641 [1966]), both of which had “indicated that . . . the New York ‘merger’ doctrine ... is not to be applied in this jurisdiction [i.e., California] to preclude a first degree felony-murder instruction based *127 upon a burglary as to which the intended felony is the homicide itself or an offense included therein” (Wilson, 1 Cal 3d at 439-440, 462 P2d at 27-28 [emphasis added]).[9] This statement implies that our traditional merger doctrine in fact would have precluded felony murder based upon a burglary as to which homicide or assault was the target crime.
As previously discussed, however, we never broadened merger beyond assault proper. Indeed, Chief Judge Cardozo specifically cited burglary as an example of a felony “independent” of the homicide and therefore not merged in it for purposes of felony murder (see Moran, 246 NY at 102; see also La Marca, 3 NY2d at 466). And in Miller, of course, we declared the merger doctrine nugatory anyway in light of revised Penal Law § 125.25 (3). We also specifically (and directly contrary to Wilson) held that a burglary premised on an intent to assault would support a felony murder conviction. No wonder, then, that we made an emphatic point in Miller to disassociate ourselves from Wilson.
Of course, today the majority completely reverses field, embracing Wilson and its progeny, which unquestionably sup *128 port its holding,[10] and backing away furiously from Miller, which unquestionably does not. Accordingly, the majority advances a number of superficial distinctions designed to distance itself from Miller.
First, the majority contends, Miller obviously does not “govern” because there we interpreted Penal Law § 125.25 (3) whereas this case involves Penal Law § 125.27 (1) (a) (vii) (majority op at 65). But, of course, the operative language in these two provisions is identical. The Legislature concededly “borrow[ed]” (majority op at 67) from the language of Penal Law § 125.25 (3) to fashion a narrower version of it as Penal Law § 125.27 (1) (a) (vii). We must presume that the Legislature was aware of Miller when adopting the first-degree murder statute (see e.g. People v Robinson, 95 NY2d at 184). Thus, the only reasonable inference to draw is that the Legislature intended (and expected) a burglary underlying a charge of first-degree felony murder to encompass “any crime” (People v Miller, 32 NY2d at 161 [internal quotation marks omitted; emphasis in original]; see also Mackey, 49 NY2d at 279); and “any crime” manifestly includes intentional murder.
Further, the Legislature would have had no reason to expect (and indeed would have had every reason not to expect) us to find Wilson and California-style merger[11] suddenly persuasive, and to revive and expand the merger doctrine so as to restrict the scope of burglary under the first-degree felony murder statute. Moreover, given the purpose of the merger doctrine—to preserve the distinctions among the culpable mental states of murder—the majority’s revival and expansion of it for first-degree felony murder, where intent must always be proven, but *129 not for second-degree felony murder, which may be unintentional, makes no logical sense.[12]
Next, the majority opines, Miller is different because it dealt with assault, not murder, and so we would, in fact, be “extending] ” Miller if we were to decide that a burglary based upon the crime of intentional murder can properly serve as the predicate for first-degree (or, for that matter, second-degree)[13] felony murder (majority op at 66 [emphasis omitted]). The dispute in Miller was, indeed, whether a burglary based upon an assault would support a conviction for felony murder; however, this was because, it was argued, the assault merged in the murder and so the assault and the murder became one and the same. We rejected merger, and concluded that the criminal objective of the predicate burglary could be any crime, which surely includes intentional murder as well as assault. I fail to see how we would be “extending]” Miller by reading the decision to mean what it manifestly says.
Finally, the majority seems to prefer the reasoning of the concurrence in Miller, and to accept defendant’s argument that the majority opinion in that case swept too broadly, or at least more broadly than was necessary to support the result (majority op at 66). To state the obvious, though, Miller’s holdings are to be found in the majority opinion, not the concurrence; the reasoning of the concurrence was not accepted by the Miller majority. Further, the concurrence’s rationale is problematic.
*130 Specifically, the concurrence would have “predicated [the result] on the narrower ground that even under the old law, when the doctrine of merger was in full bloom, a conviction of felony murder was sustained where the underlying offense was assault if the assault was committed on a person other than the one killed” (Miller, 32 NY2d at 161 [Jones, J., concurring]). Wagner and the other cases cited for this unexceptionable proposition,[14] however, were all decided under the “old law” (section 1044 [2] of the former Penal Law), and so their holdings were grounded in statutory language superseded in the revised Penal Law (see discussion at 120-124). Additionally, these were all assault cases, not burglary-predicated-on-assault cases, as Miller was. It bears repeating that “even . . . when the doctrine of merger was in full bloom” (Miller, 32 NY2d at 161), we consistently declined to extend merger beyond assault to other crimes (e.g., rape, kidnapping, larceny, robbery or burglary). Although force and violence were (or might be) an element of these other crimes, their “essence” (e.g., for burglary, the unlawful entering or remaining in a building) was independent of homicide.
C. Foreign Cases
Lacking support in New York statutes and precedent, the majority finally retreats to foreign cases to support its holding that capital felony murder must have a criminal objective independent of the intentional murder (majority op at 69). As the majority acknowledges, two of these sister-state cases—Williams v State (818 A2d 906 [Del 2002]) and Parker v State (292 Ark 421, 731 SW2d 756 [1987])—are nothing more than interpretations of Delaware’s and Arkansas’ rather different capital statutes. Additionally, Williams and Parker both deal with capital felony murder statutes that are closer to our traditional (second-degree) felony murder statute than to our first-degree felony murder statute.
*131 Specifically, these statutes do not require an intentional killing, and instead appear designed “to reduce the disproportionate number of accidental homicides which occur during the commission of the enumerated predicate felonies” (Miller, 32 NY2d at 161). Indeed, Delaware requires a “reckless[ ]” murder (see Del Code Ann, tit 11, § 636 [a] [2]), while in Arkansas, the killing had to have been “under circumstances manifesting extreme indifference to the value of human life” (Parker, 292 Ark at 425, 731 SW2d at 758).
It is, thus, quite surprising that the majority considers Parker and Williams so convincing. After all, the majority views our own traditional felony murder jurisprudence in Miller as irrelevant mainly because that crime, like the crimes addressed in Williams and Parker, does not require an intentional murder (majority op at 65). By contrast, the Arkansas Supreme Court itself considered Miller entirely relevant, but rejected the Miller distinction between a murder committed in an occupied dwelling as opposed to out of doors. The court concluded that what might make sense in New York did not automatically make sense in Arkansas because of its different statutes (Parker, 292 Ark at 426-427, 731 SW2d at 759).
The majority cannot have it both ways. If Miller is of no value here, as the majority contends, then Williams and Parker are at least equally useless. Alternatively, if it is legitimate to rely on foreign cases dealing with statutes similar to the statute underlying Miller, then Miller must be relevant here.
Ultimately, the majority rests its conclusion principally upon the opinion of the California Supreme Court in People v Green (27 Cal 3d 1, 609 P2d 468, supra) (majority op at 70-71). Our decisions in Miller and People v Harris (98 NY2d 452 [2002]), however, undermine any reliance on Green.
In Green, the California Supreme Court justified the need for an “independent objective” by reference to Eighth Amendment narrowing concepts. In Harris, however, we expressly rejected a claim that the first-degree felony murder statute did not comport with the narrowing requirements of the Eighth Amendment (Harris, 98 NY2d at 475-477). There is no reason for us to shrink from that conclusion here.
We noted in Miller that it was “apparent that the Legislature, in including burglary as one of the enumerated felonies as a basis for felony murder, recognized that persons within domiciles are in greater peril from those entering the domicile *132 with criminal intent, than persons on the street who are being subjected to the same criminal intent” (Miller, 32 NY2d at 160). The concern for preventing violence in domiciles that led the Legislature to include burglary in the second-degree felony murder statute informs the first-degree statute under consideration here.
As discussed earlier, the traditional, second-degree statute is predicated upon “burglary” of any degree (see Penal Law § 125.25 [3]). But when the Legislature “borrowed” from that statute, it slightly narrowed intentional felony murder so as to include only first-degree or second-degree burglary (see Penal Law § 125.27 [1] [a] [vii]). Significantly, only those two degrees of burglary expressly encompass crimes committed in a “dwelling” (see Penal Law § 140.25 [2]; § 140.30); third-degree burglary references only a “building” (see Penal Law § 140.20). Thus, the Legislature clearly structured the first-degree felony murder statute to deter and punish intentional killings in a “dwelling.”
The legislative goal of protecting the citizens of our state from burglars with a murderous intent nullifies any Eighth Amendment fears. As just discussed, we took note in Miller of the extremely rational legislative “recognition]” of the “greater peril” faced by persons in their homes (Miller, 32 NY2d at 160). Because of that “greater peril,” the Legislature ensured that “the burglary statutes prescribe greater punishment for a criminal act committed within the domicile than for the same act committed on the street” (Miller, 32 NY2d at 160).
The “greater punishment” for committing the “same act” in a dwelling rather than “on the street” obviates the need for the burglary here to have had an objective independent of murder. The Legislature quite rationally concluded that a burglar—like defendant—who fulfills a specific murderous intent is deserving of “greater punishment” than a defendant who commits the “same act ... on the street” (id.). Thus, providing the death penalty for the crime committed here in no way runs afoul of the Eighth Amendment (Harris, 98 NY2d at 476). Indeed, it is not merely an intent to kill, but rather burglarizing a dwelling to fulfill that murderous intent which differentiates (and correspondingly narrows) this murder from its lesser included offense of second-degree intentional murder.
*133 Simply put, the Eighth Amendment concerns expressed by the California Supreme Court in Green are not present here.[15] The Eighth Amendment does not require that a burglary underlying a felony murder (especially an intentional murder) be predicated upon an independent criminal objective (see e.g. State v Tillman, 750 P2d 546, 571 [Utah 1987]; Smith v State, 499 So 2d 750, 754 [Miss 1986]; see also State v Dann, 205 Ariz 557, 568 n 7, 74 P3d 231, 242 n 7 [2003] [implying that merger doctrine would not preclude capital felony murder conviction for burglary premised on intent to kill]).
II. Jury Selection
I cannot agree that the trial court erred in its rulings under CPL 270.20 (1) (f) regarding prospective jurors Nos. 23 and 855. The trial court’s rulings, viewed in light of the entire voir dire for these prospective jurors, comported with the standards for life/death qualification that we just enunciated in Harris (98 NY2d at 485-487). The majority spotlights selected snippets from a lengthy record. We were not there; the Trial Judge was. As we recognized long ago when construing section 377 of the former Code of Criminal Procedure (the statutory predecessor of CPL 270.20 [1] [f]), “it was for the court to say, from the whole examination of the juror, including his appearance and demeanor, whether he was fit and competent to perform fairly and impartially” (People v Carolin, 115 NY 658, 659 [1889]).[16]
*134 In the end, this Trial Judge presided over eminently fair, error-free jury selection, in which he correctly applied subdivision (1) (f) in an even-handed manner. Indeed, the trial court and the parties went to extraordinary lengths to impanel a fair and impartial jury: jury selection involved over 900 prospective jurors, took more than two months, and included a comprehensive written questionnaire followed, as necessary, by extensive individual and then group voir dire.[17] We should not upset this handiwork because we might have asked prospective jurors more or different or better questions during voir dire or might have otherwise created a fuller record; or because some of the prospective jurors strike us as more or less qualified than the Trial Judge reasonably assessed them to be in the immediacy of a trial setting. Jury selection is not a mechanical exercise. In a capital case, in particular, jury selection is necessarily exhaustive and emotional. We do not want to discourage trial courts from independently assessing a prospective juror’s credibility and sincerity; we do not want to force trial courts to rely on rote assurances of impartiality whether or not they “ring true.” Nor do we want to convey a sense that jury selection errors are inevitable in every capital case because of our willingness to parse the record so as to make them so.
*135 A. Prospective Juror No. 23
Under the standards for life/death qualification explained in Harris, the trial court properly concluded that prospective juror No. 23 had been life qualified. Certainly, prospective juror No. 23 never expressly “rule[d] out voting against” the death penalty (majority op at 44). Indeed, prospective juror No. 23 repeatedly and consistently assured the parties and the trial court that he could consider both death and life. Responding to the prosecutor, for example, he unequivocally stated that he would “fulfill my [sentencing] responsibility[ ] fairly and impartially,” and that he could consider both sentences “[e]qually.” Prospective juror No. 23 then made similar assurances during a colloquy with defense counsel.
The majority’s conclusion that prospective juror No. 23 had not been life qualified rests entirely upon his voluntary disclosure of a personal near experience with domestic violence. By zeroing in on that lone section of the lengthy voir dire, the majority deems irrelevant prospective juror No. 23’s prior voir dire assurances that he could, indeed, consider a life verdict. Significantly, in Harris we rejected an essentially indistinguishable challenge to the life qualification of prospective juror No. 233.
Prospective juror No. 233 expressed “strong skepticism” regarding the defendant’s proposed mitigating factor of child abuse (Harris, 98 NY2d at 485). The defendant subsequently challenged prospective juror No. 233 for cause under subdivision (1) (f), and the trial court rejected the challenge (id. at 486) . In holding that the trial court ruled properly, we determined that subdivision (1) (f) required a “connection” between a proposed juror’s death penalty views “and its effect on that juror’s consideration of the appropriate sentence” (id. at 486, 487) . We noted that the “[defendant made no correlation between Juror No. 233’s views on child abuse and her views on the death penalty or her ability to exercise sentencing discretion conferred by statute” (id. at 487).
While defendant here may have established some “correlation” between prospective juror No. 23’s views and his sentencing ability, defendant never demonstrated the link that we viewed as “[c]ritical[ ]” in Harris (id. at 486). Specifically, as was the case with prospective juror No. 233 in Harris, prospective juror No. 23 “was never asked if ... [ ]he could still vote to give defendant life without parole” (id.).
*136 No doubt, defendant took prospective juror No. 23 right up to the brink of that question. The voir dire ended with prospective juror No. 23’s acknowledgment that, as defendant phrased it, this “life experience ... is causing you some concern as to whether you’d be able to consider both penalties fairly”; and “[t]hat would cause you some problems with being able to consider life without parole as the appropriate penalty other than death” (emphasis added). But having “some concern” or “some problems” does not translate into an affirmative statement that prospective juror No. 23 could not “vote to give defendant life without parole” (Harris, 98 NY2d at 486). Thus, here, as in Harris, “defendant has failed to make a claim that his for-cause challenge against Juror No. 23 [ ] pursuant to CPL 270.20 (1) (f) should have been granted” (id. at 487).
The majority unfairly takes the trial court to task for supposedly failing to pose additional questions {see majority op at 46). But, as the majority recognizes, “[t]he proponent of the challenge must demonstrate through questioning the juror’s inability to fulfill his or her oath” (majority op at 46, citing Morgan, 504 US at 733). Thus, defendant bore the burden of making the necessary record to support his subdivision (1) (f) challenge. The trial court heard nothing that merited continued questioning or granting defendant’s challenge. Again, the facts of the voir dire are instructive.
The record reveals someone struggling with his emotions, informing the court and parties honestly that he had every intention of following his obligations if selected. Indeed, prospective juror No. 23 expressly stated that “it’s possible that [my life experience] could come to mind. As much as I’m sitting here and I’m trying to promise everybody that I’d be fair, I’m still human, I’m still a man, that could come to mind. That’s being honest.” Thus, the record—far from showing a juror who was not life qualified—bespeaks someone caught up in the assuredly emotional context of a capital case. In fact, the trial court specifically cited prospective juror No. 23’s candid and heartfelt disclosures as a basis for rejecting defendant’s challenge. Following group voir dire, defendant renewed his challenge. The trial court adhered to its original ruling, noting that prospective juror No. 23 had actually been crying when he related his life experience.
Prospective juror No. 23’s emotional reflections and the depth of his feelings did not constitute grounds for his exclusion. Construing subdivision (1) (f) in Harris, we concluded that “[w]e *137 understand the word ‘preclude’ to relate to the ability of a prospective juror to perform his or her duty to act impartially and to follow a court’s instructions in accordance with the law and not as a measurement of the strength or sincerity of an individual’s feelings on the death penalty” (Harris, 98 NY2d at 484). As we also noted in Harris, under controlling Supreme Court precedent “ ‘[n] either nervousness, emotional involvement, nor inability to deny or confirm any effect whatsoever is equivalent to an unwillingness or an inability on the part of the jurors to follow the court’s instructions and obey their oaths, regardless of their feelings about the death penalty’ ” (id. at 483, quoting Adams v Texas, 448 US 38, 50 [1980]).
If anyone is to blame for any lack of follow-up in this case, it is defendant, not the trial court or the People. While the majority states that defendant “immediately” challenged prospective juror No. 23, that is not the case. After eliciting only that prospective juror No. 23 could have “some concernís],” defendant asked for “just a minute.” After the consequent pause in the proceedings, defendant asked no further questions; specifically, defendant did not ask prospective juror No. 23 if he could vote for life, the question that we found to be critical in Harris.
In sum, prospective juror No. 23 never expressed any “unwillingness or an inability” to obey his oath. At most, he indicated “some” concerns premised on his emotions, nothing more. The trial court properly took into account prospective juror No. 23’s “appearance and demeanor”—specifically noting that he had been crying—when rejecting defendant’s for-cause challenge under CPL 270.20 (1) (f) (Carolin, 115 NY at 659; see also Harris, 98 NY2d at 486-488). Accordingly, the trial court did not err when it denied defendant’s subdivision (1) (f) challenge to prospective juror No. 23.
B. Prospective Juror No. 855
The trial court also did not err when it granted the People’s subdivision (1) (f) challenge to prospective juror No. 855. The full voir dire and questionnaire of this juror reveal someone who was not death qualified. Furthermore, the record completely belies the majority’s assertion that the trial court somehow favored the People in this instance.
In People v Carolin (115 NY 658, supra), the trial court granted several challenges by the People to prospective jurors, each of whom had “said, in substance, that his scruples were such as would render him ‘extremely reluctant to find the de *138 fendant guilty of murder in the first degree’ ” {id. at 659). Later, the jurors’ statements were “attenuated and somewhat modified by further examination” {id.). We held that the trial court properly granted the People’s challenges because—despite the statements of impartiality by the jurors—“it was for the court to say, from the whole examination of the juror, including his appearance and demeanor, whether he was fit and competent to perform fairly and impartially” {id.).
Here, by contrast, the prospective juror was more than “extremely reluctant” to impose the death penalty. Pointing to prospective juror No. 855’s questionnaire, the majority states merely that she “equivocated” in her views regarding the death penalty (majority op at 46). Indeed, at times, prospective juror No. 855 checked boxes marked “yes” to indicate that she could deliberate impartially and consider the death penalty. Those generic answers, however, must be juxtaposed against her initial, express written statement (unmentioned by the majority) that “[i]n my heart I do not believe I have or could condone death for another person for [sic] punishment.”
Several other answers and written statements (again, all unmentioned by the majority) similarly reveal a juror who appears unwilling to impose the death penalty. For instance, in the first question requiring a checked answer regarding the death penalty in this case, prospective juror No. 855 checked “no” when asked “[i]f the People prove the defendant guilty beyond a reasonable doubt of Murder in the First Degree, could you consider the death penalty as one of the available punishments.”
Then, prospective juror No. 855 indicated that she would not be able to “set aside [her] own views and conscientiously apply the law to the facts of this case in accordance with the Judge’s instructions” “[i]f the law, as presented to [her] by the Judge in this case, is contrary to [her] present personal beliefs concerning the death penalty.” Explaining this answer, prospective juror No. 855 wrote that “I am morally responsible for my own actions and decisions.”
As if these answers were not sufficient reason to disqualify prospective juror No. 855, another of her responses could only have caused the People and the trial court grave apprehension. Specifically, prospective juror No. 855 did not consider it “wrong for a juror to go through the whole trial and then during the penalty phase deliberations express for the first time that they would never or always vote for the death penalty regardless of the facts of the case.”
*139 Thus, the trial court was confronted with a potential “stealth” juror; i.e., a juror who believed that her personal opposition to capital punishment trumped any obligation to comply with her oath, and also allowed her to seek to be selected so that she could ensure a non-death sentence; in short, a juror willing to sabotage the trial. This had to make the Trial Judge seriously question the credibility of those questionnaire answers in which prospective juror No. 855 indicated that she would deliberate fairly. Similarly, even if this juror later said all the “right things” during voir dire, her questionnaire responses could only cause the trial court to view her with some skepticism if not outright suspicion.
Indeed, when challenging prospective juror No. 855 the People expressly pointed out to the Trial Judge that, “[f]irst of all you have the ability to have seen her body language and her in person.” And, contrary to the majority’s view of the record, the People never asked for prospective juror No. 855’s exclusion because her death penalty views were “unknown” (majority op at 48). The People expressed concern that prospective juror No. 855 “has an inner moral compass that says she is opposed to the death penalty except ... in quote certain circumstances [w]hich she is unwilling or unable to tell us what they are.” The People then noted that “[t]he only criteria she elaborates on is multiple victims.” The only thing “unknown,” according to the People, was “[w]hat those other inner workings of her own personality are that trigger her consideration of the death penalty”; not prospective juror No. 855’s death penalty views.
The People challenged prospective juror No. 855 because of the reasonable belief that she was irrevocably opposed to capital punishment except perhaps in a case involving multiple victims. Contrary to the majority’s conclusion, the People never invited the trial court to exclude prospective juror No. 855 on the basis of her “unknown” views of the death penalty. Instead, the People focused on prospective juror No. 855’s inability to credibly indicate that she could vote for death “in this case” (Harris, 98 NY2d at 485 n ll).[18]
The majority also ignores and misconstrues the trial court’s reason for granting the People’s challenge. In fact, the majority *140 never mentions that the trial court premised the exclusion of prospective juror No. 855 on the facts that “I have listened to [her], I have formed my opinion.” And the trial court had to be “listening]” to prospective juror No. 855 and observing her “body language” during voir dire, while inevitably mindful of her dubious questionnaire responses (see Carolin, 115 NY at 659). As we have long recognized, even if a prospective juror’s “extreme[ ] reluctan[ce]” to impose the death penalty is “attenuated and somewhat modified by further examination, it was for the court to say, from the whole examination of the juror, including his appearance and demeanor, whether he was fit and competent to perform fairly and impartially his duty as a trior of the issues which involved such result” (id.). This is exactly what the trial court did here.[19]
Nor did the trial court apply different standards to prospective jurors Nos. 23 and 855. In reaching a contrary conclusion, the majority does not acknowledge that the trial court in both instances took into consideration “appearance and demeanor” (Carolin, 115 NY at 659), and was in a position—as we most decidedly are not—to assess these jurors’ questionnaire and voir dire answers in that light.
The trial court took pains to note that prospective juror No. 23 had been crying while relating his life experience. The trial court concluded that prospective juror No. 23 was serious about carrying out his oath if selected. By contrast, the trial court considered prospective juror No. 855, who had indicated a willingness to deceive the court and parties regarding her true intentions, to be unworthy of belief after “listening]” to her and watching her “body language.” The trial court did not apply different standards to each party’s for-cause challenge; applying the same standard, he reasonably reached different *141 conclusions about each prospective juror’s credibility and ability to deliberate impartially.
As the majority cautions, trial courts must scrupulously guard against jury selection errors, especially in a resource-intensive capital case. Of course, the trial court here properly excluded prospective juror No. 855 precisely because seating her might have led to a waste of resources. Indeed, a “stealth” juror bent on determining the outcome of a capital case forces both the parties and the judiciary to expend resources needlessly. A “stealth” juror poses an equal danger of injustice to a capital defendant, the People, and the justice system.
III. Conclusion
The majority opinion is a remarkable piece of judicial legerdemain, shot through with after-the-fact analysis. Legitimate choices made by the Legislature, by the Miller court and by the Trial Judge are vigorously second-guessed and overthrown from the safe remove of our appellate aerie. Finally, of course, the majority overturns the measured, reasoned verdict that 12 citizens of our state undoubtedly struggled to reach in what was likely the most solemn responsibility they will ever have to undertake.
For all the reasons stated, I would affirm defendant’s conviction for first-degree felony murder. For the reasons stated by Judge Graffeo, I would also affirm defendant’s conviction for first-degree witness elimination murder. I respectfully dissent from the majority’s conclusion in Part II regarding prospective jurors Nos. 23 and 855, and from the reversal of defendant’s first-degree murder convictions in Part III.
Finally, the majority’s disposition of this case renders the sentencing issues academic (see Harris, 98 NY2d at 497; see also People v Davis, 43 NY2d 17, 29 [1977], cert denied 435 US 998 [1978]). We are constitutionally and prudentially precluded from issuing advisory opinions (see Harris, 98 NY2d at 497).
Chief Judge Kaye and Judge Ciparick concur with Judge Rosenblatt; Judge G.B. Smith concurs in result in a separate opinion in which Judge Ciparick concurs insomuch thereof as addresses deadlock jury instructions; Judge Graffeo concurs in part and dissents in part in another opinion in which Judge Read concurs; Judge Read concurs in part and dissents in part in an opinion in which Judge Graffeo concurs.
Judgment modified, etc.

. This interpretation is consistent with cases that involve the deaths of firefighters caused by arson. If “in furtherance of’ can mean only “advance or facilitate” as defendant argues, there are numerous felony-murder convictions that should have been vacated. For example, in People v Zane (152 AD2d 976 [4th Dept 1989], lv denied 74 NY2d 900 [1989]), the defendant was convicted of felony murder “for having caused the death of a fireman in the course of and in furtherance of the crime of arson” (id. at 976)—even though the firefighter died after the arson had been completed. In this situation, the firefighter’s death obviously did not “advance or facilitate” the arson but it was logically related to that crime and, therefore, satisfied the in furtherance of requirement (see also People v Corey, 233 AD2d 773 [3d Dept 1996]).

. The majority’s discussion of how other states’ courts have treated the merger doctrine warrants only brief discussion in my writing because I concur with Judge Read’s thorough and well-reasoned analysis of this issue. Suffice it to say, the new rule adopted by the majority is supported only by California jurisprudence (see e.g. People v Green, 27 Cal 3d 1, 59-62, 609 P2d 468, 504-506 [1980]; People v Wilson, 1 Cal 3d 431, 462 P2d 22 [1969]; People v Ireland, 70 Cal 2d 522, 450 P2d 580 [1969]). Tellingly, the majority is unable to identify any other state that has a merger doctrine similar to the one applied in this case. The cases from Delaware and Arkansas cited by the majority do not rely on the merger doctrine but engage in a plain language analysis of their statutes—specifically, their “in furtherance of’ requirements (see Williams v State, 818 A2d 906, 910-913 [Del 2002]; Parker v State, 292 Ark 421, 425-427, 731 SW2d 756, 758-759 [1987]). In fact, the Delaware Supreme Court, in the recent decision cited by the majority, explicitly rejected a “merger” argument substantially similar to the one posed in this case (see Williams v State, 818 A2d at 909-910; see also Steckel v State, 711 A2d 5, 12 [Del 1998]).

. The majority explicitly recognizes that the first-degree murder statute applies to only a portion of defendants who commit felony-murder in the second degree (majority op at 67, 68 [acknowledging that the first-degree statute “is critically different because it deals with intentional, not unintentional, killings” and “does not apply where the defendant’s liability is based on someone else’s conduct (unless the defendant commanded the murder)”]). The ma *105 jority nonetheless fails to connect those limitations to the federal constitutional definition of the narrowing requirement.

. See People v Weidert, 39 Cal 3d 836, 842, 705 P2d 380, 383 (1985); Ario v Superior Ct, 124 Cal App 3d 285, 289-290, 177 Cal Rptr 265, 267-268 (Ct App 1981).

. See People v Clark, 50 Cal 3d 583, 606-609, 789 P2d 127, 142-144 (1990). But see State v Grant, 67 Ohio St 3d 465, 473-474, 620 NE2d 50, 62 (1993).

. The relevant statutory text reads: “[a] person is guilty of murder in the first degree when . . . [w]ith intent to cause the death of another person, he causes the death of such person or of a third person; and . . . the intended victim was a witness to a crime committed on a prior occasion and the death was caused for the purpose of preventing the intended victim’s testimony in any criminal action or proceeding.”

. Defendant initially gave the following statement to the police: “Around 4 or 4:15 AM this morning April 21, 1998 I was awakened by Jill. She grabbed my face and wrenched me over and then grabbed my arms and held me down. She was saying words to the effect, I’m not going to live here . . . indicating she no longer had a life here. I then got up and went downstairs. She followed me down and was yelling at me. ... I had went in the kitchen and was standing near the refrigerator. Jill came into the kitchen. The argument continued, Jill went to the opposite side of the room .... Jill picked up a knife . . . sort *110 of like a filllet [sic] knife with maybe a 6 to 7 inch tapered b[la]de. ... I tried to take the knife from her. She struck at me cutting my left forearm. I got a hold of her, in a position with her facing away from me with my arms around her and forced her out the back door of the house into a mud room. I [sic] As we were going out she was calling to the children, call the police, your father is trying to kill me. I pushed her to the floor and we wrestled a bit. She continued to call to the children. I pushed up and turned to get away, she was on the floor face down. I saw several baseball bats hanging on the wall and grabbed one. I turned to face her again and she was getting up facing me with her hands about chest high. She still had the knife in her right hand. I swung with the bat hitting her on the left side of the head. As I swung she raised her hands alongside her head. She started to move backwards and I swung again. This time she went backwards falling out of the back door onto a concrete patio . . . .”
In his later statement, however, defendant stated: “after she pulled the knife ... I got Jill in a bear hug type position with her back to me. I got Jill out to the mud room and down on the floor. I got up got the baseball bat and Jill was on her feet with the knife in her right hand I swung the bat twice at her and on the second swing, I hit Jill on the head. Jill fell back and out the door . . . .”

. The record does not suggest that defendant’s mother intended to assist her son and she was never charged with any crime.

. According to defendant’s confessions, his children saw defendant beat their mother in the head with the baseball bat and heard her pleas for help. At one point, Jill called out to her daughter, begging her “to call the police, your father is trying to kill me.” However, nothing in the record suggests that the children witnessed (or defendant believed that they had witnessed) what transpired between defendant and Jill before he began attacking her with the bat.

. Miller involved the degreeless crime of “murder” under Penal Law § 125.25 (3), which, at the time, was potentially a capital crime in circumstances not present in Miller (see L 1965, ch 1030 [adding Penal Law § 125.25]; L 1968, ch 949 [amending Penal Law § 125.30]). In 1974, the Legislature amended the Penal Law by creating first-degree murder and classifying section 125.25 as second-degree murder (see L 1974, ch 367, §§ 4, 5).

. Normally, a nonslaying defendant faces accessorial liability when, acting with the requisite mental state necessary to commit an offense, “he solicits, requests, commands, importunes, or intentionally aids” another person to commit the offense (Penal Law § 20.00); however, for first-degree felony murder, the Legislature restricted accessorial liability to a defendant who “command[s] another person to cause the death of the victim or intended victim” (Penal Law § 125.27 [1] [a] [vii]). The Legislature did not similarly restrict accessorial liability for the other 12 subdivisions of the first-degree murder statute.

. The evidence showed that the victim was strangled with a strap or rope drawn around her neck by the defendant while he was attempting to rape her. There was also evidence that the victim suffered a violent blow to the head. The judge charged the jury on premeditated and deliberate murder, and also instructed that “if the [victim] resisted, and the [defendant] overcame that resistance by putting the rope around her neck, and thus made her incapable of resistance, and under these circumstances committed the offense, even although he did not intend to take her life, . . . , and she died while he was thus engaged in that act,” then it was felony murder (Buel v People, 78 NY at 496). The statute in effect at the time defined felony murder as homicide “perpetrated by a person engaged in the commission of any felony” (2 Rev Stat of NY, part IV¡ ch I, tit I, § 5 [3], at 657 [1st ed], as amended by L 1873, ch 644, § 1, and by L 1876, ch 333 [emphasis added]).

. Section 183 of the Penal Code defined felony murder at the time as homicide committed “without a design to effect death, by a person engaged in the commission of, or in an attempt to commit a felony, either upon or affecting the person killed or otherwise” (emphasis added).

. The trial court charged the jury on deliberate and premeditated murder as well as felony murder predicated on any of three crimes: burglary, grand larceny and assault. The defendant appealed only so much of the charge as related to assault.

. The applicable statute, section 1044 (2) of the former Penal Law, was derived from and worded identically to the felony murder provision of section 183 of the Penal Code.

. See Note, The Doctrine of Merger in Felony-Murder and Misdemeanor-Manslaughter, 35 St John’s L Rev 109, 126 (1960) (“Assault merges with the homicide because it is a necessary ingredient of the homicide, and, for this reason, when one is on trial for murder and manslaughter, he is also on trial for assault. In New York and similar jurisdictions all felonies with the exception of assault have been held not to merge with the homicide” [emphasis added]).

. In California, first-degree felony murder is statutory whereas second-degree felony murder is apparently largely left for the judiciary to define (see e.g. J.K. Van Patten, Comment, Merger and the California Felony-Murder Rule, 20 UCLA L Rev 250, 251-254 [1972]; see also Tomkovicz, The Endurance of the Felony-Murder Rule: A Study of the Forces That Shape Our Criminal Law, 51 Wash & Lee L Rev 1429,1464-1466 nn 143, 144,147 [1994] [commenting generally on the California Supreme Court’s “hostility” towards felony murder in the 1960’s, 1970’s and early 1980’s, and the consequent judicial restrictions, such as merger, placed by the court on its scope and operation]).

. In Hamilton, the challenged felony murder instruction informed the jury that the killings were of the first degree if committed by the defendant in the perpetration of or attempt to perpetrate a burglary; and that the burglary consisted of entering a dwelling with the intent to commit a felony therein, namely felonious assault. The California Supreme Court upheld the instruction, noting as follows: “[Defendant urges that where, as here, the felony itself (burglary) results from the existence of the very intent necessary to establish the homicide, that the element of causation necessary for application of the [felony murder] doctrine is not present. It is the theory of the defendant that the ‘felony-murder’ rule should only be applied when the felony involved is an independent felony and not an integral part of a homicide plan. While it is true that this independent felony test has apparently been adopted in New York [citing Huter], and that a reasonable argument can be made that such should be the rule, it is not the rule that has been applied in California. . . . The rule as adopted in this state is not clearly wrong, nor is the New York rule clearly right. Either conclusion is equally reasonable. There is no sound reason why California should change its rule at this late date” (Hamilton, 55 Cal 2d at 901, 362 P2d at 485). In Talbot, the defendant bludgeoned the victim to death in the kitchen of a house where the victim was staying overnight. The question on appeal was whether the evidence was sufficient to warrant instructions on murder committed in the perpetration of a burglary, and the court decided that it was. The defendant had contended that he entered with intent to assault, not to kill, and that the felony murder rule was inapplicable because the felony intended upon his entry was an integral ingredient of the murder. In rejecting this contention, the court noted that a similar argument had been rejected in Hamilton, and quoted the passage from Hamilton in which it had declined to adopt what it referred to as New York’s “independent felony test” (Talbot, 64 Cal 2d at 703, 414 P2d at 641).

. The California Supreme Court continues to hew the Wilson line. Most recently, the court opined in People v Seaton (26 Cal 4th 598, 646, 28 P3d 175, 202 [2001]), which cites Wilson, that “[although the intent to commit any felony or theft, including the intent to unlawfully kill or to commit felonious assault, would support a burglary conviction, the felony-murder rule and the burglary-murder special circumstance do not apply to a burglary committed for the sole purpose of assaulting or killing the homicide victim” (emphasis added; see also People v Garrison, 47 Cal 3d 746, 778, 765 P2d 419, 435 [1989] [“(A)n entry with the specific intent to commit murder cannot support a felony-murder conviction under the doctrine of merger explained in People v. Ireland (citation omitted) and People v. Wilson (citation omitted)”]).

. As the People and the Attorney General observe, the majority of states reject California-style merger, preferring the far narrower version of the merger doctrine pioneered in New York.

. Our colleagues chide Judge Graffeo and me for supposedly mischaracterizing their decision “as a revival and expansion of the ‘merger doctrine’ ” (majority op at 66 n 35). I can only reply that expanding “merger” is what we called what we refused to do in Miller and what the majority does here; and that when the California Supreme Court did exactly what the majority now does, that court talked in terms of “merger” (see n 10, supra). “If it looks like a duck, walks like a duck and quacks like a duck, then it just may be a duck” (The Oxford Dictionary of Quotations 624:17 [1999]).

. Although the majority is “[un]aware of a single case in which [any New York court has] ever discussed whether a felony murder conviction may be based upon a burglary with an underlying intent to kill, let alone held that way” (majority op at 68 [emphasis added]), this is not to say that prosecutors have hesitated to charge second-degree felony murder on this theory when the facts warrant (see e.g., People v Kellogg, 210 AD2d 912 [1994] [defendant charged with being, and convicted as an accessory to second-degree felony murder premised on burglary with intentional murder as its sole criminal objective]). I agree with the majority that no cases appear to have discussed the issue, which presumably means only that felony murder has been infrequently charged on this basis and/or has not been challenged when it has been charged. Certainly, the defendant in Kellogg did not think to appeal her conviction for this reason.

. The year after Wilson was decided, the California Supreme Court explicitly rejected our Wagner rationale: “[I]n New York it has been held that, although the felony-murder rule does not apply where a defendant intentionally assaults each of his two victims who die as a result of the assaults, the rule is applicable if the defendant assaulted one person but killed another who came to the first’s defense [citing Moran and Wagner] .... [W]e are satisfied that the distinction made by the New York cases is untenable in the light of ordinary principles of culpability. It would be anomalous to place the person who intends to attack one person and in the course of the assault kills another inadvertently or in the heat of battle in a worse position than the person who from the outset intended to attack both persons and killed one or both” (People v Sears, 2 Cal 3d 180, 188-189, 465 P2d 847, 852 [1970]).

. In my view, the Green case does not, in any respect, “address[ ] a question similar to the one before us” (majority op at 70). As the majority acknowledges, Green involved robbery, not burglary. It has subsequently been cited for the proposition that, in order to establish California’s robbery-murder special circumstance for capital murder, “the People had to prove that [the] defendant formed the intent to steal before or while killing [the victim]” (People v Yeoman, 31 Cal 4th 93, 127, 72 P3d 1166, 1194 [2003]; cf. People v Bornholdt, 33 NY2d 75, 82 [1973]; People v Joyner, 26 NY2d 106, 109 [1970]; People v Rice, 61 AD2d 758 [1st Dept 1978]).

. Subdivision (8) of section 377 of the former Code of Criminal Procedure provided a for-cause challenge to a prospective juror for “[i]f the crime charged may be punished with death, the entertaining of such conscientious opinions as would preclude . . . finding the defendant guilty.” Significantly, the Legislature incorporated the former Code section into subdivision (1) (f) of CPL 270.20 “without substantial change” (Commn Staff Notes, reprinted following CLS, Book 7D, CPL 270.20). Because of that, I do not agree with the majority that the Legislature adopted subdivision (1) (f) as a “response” to Witherspoon v Illinois (391 US 510 [1968]). In fact, subdivision (1) (f) simply continued, virtually verbatim, this State’s long-standing death qualification provision (see e.g. 2 Rev Stat of NY, part IV ch II, tit Y § 12, at 734 [1st ed 1829]; see also 1 Laws of NY, § XXVIII, at 335 [1813]). Moreover, the *134 Legislature built on the Code, and went well beyond Witherspoon by including a life qualification provision (see L 1970, ch 996) more than two decades before the Supreme Court so mandated (see Morgan v Illinois, 504 US 719 [1992]). The Legislature also expanded a for-cause challenge based on death penalty views to include a prospective juror’s inability to deliberate at a separate sentencing proceeding (Witherspoon involved a single-stage capital trial, and a challenge under the Code pertained only to a guilt verdict, not to the bifurcated penalty proceeding). The adoption of subdivision (1) (f) represented yet another step in the Legislature’s traditional, long-standing commitment to ensuring an effective and fair death penalty scheme. That is not to say that the Legislature ignored Witherspoon when adopting CPL 270.20. Surely, the Legislature contemplated that Witherspoon would apply when a capital case trial court committed a jury selection error, thus making remedial action necessary. Accordingly, I agree with the majority that a jury selection error going solely to a prospective juror’s ability to determine penalty results in reversal of the sentence only, and not a conviction, under subdivision (2) of CPL 270.20. This is exactly the remedy that the Witherspoon court held was necessary; it is consistent with what the Legislature did, considering its expansion of subdivision (1) (f) to cover penalty phase, as well as guilt phase, deliberations.

. The prospective jurors filled out questionnaires on May 26, 1999. During the month of June, the parties and the trial court reviewed the questionnaires and dismissed some prospective jurors on the basis of their written responses. Then the remaining prospective jurors returned to court on July 1, 1999. The voir dire took place during 11 full court days in July 1999 and one day in August 1999.

. The majority claims that I would free the People from challenging prospective juror No. 855 on her views regarding the suitability of the death penalty in this case (see majority op at 48 n 14). To the contrary, the People were concerned about this juror precisely because of an inability to discern if she could vote for death in this case as opposed to the vague, hypothetical case involving multiple victims, which is what she kept citing. Moreover, defendant *140 contributed to the People’s lack of knowledge: defense counsel successfully objected when the District Attorney attempted to question the juror regarding penalty “in this case.”

. Even under the “unequivocal assurance” standard of CPL 270.20 (1) Ob), we recognize that a prospective juror’s words alone are not enough, and that the trial court must determine whether the juror is speaking credibly (see e.g. People v Johnson, 94 NY2d 600, 611 [2000], citing People v Culhane, 33 NY2d 90, 107 [1973]). Indeed, whether a prospective juror is qualified under subdivision (1) (b) is “a determination committed largely to judgment of the Trial Judge with his peculiar opportunities to make a fair evaluation” (Johnson, 94 NY2d at 613), and one to which we “should defer” (People v Johnson, 92 NY2d 976, 978 [1998]). Moreover, when determining whether a prospective juror is qualified to sit under subdivision (1) (b), the voir dire must be analyzed in its entirety, not selectively (see e.g. Johnson, 94 NY2d at 615).